

**IT IS ORDERED as set forth below:**


**Date: January 10, 2017**

_____

**Paul W. Bonapfel**
**U.S. Bankruptcy Court Judge**

_____



# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| INTERNATIONAL MANAGEMENT | : | Jointly Administered Under |
| ASSOCIATES, LLC, et al., | : | Case No. 06-62966 |
| Debtors. | : | |
| | : | |
| WILLIAM F. PERKINS, in his capacity | : | |
| as Chapter 11 Trustee of International | : | |
| Management Associates, LLC, and its affiliated | : | |
| Debtors, | : | |
| Plaintiff, | : | Adv. No. 08-06186 |
| vs. | : | |
| | : | |
| LEHMAN BROTHERS, INC.; OPPENHEIMER | : | |
| & CO., INC.; J.B. OXFORD & COMPANY; | : | |
| BANC OF AMERICA SECURITIES, LLC; | : | |
| and TD AMERITRADE, INC., | : | |
| Defendants. | : | |

# ORDER ON SECOND MOTION OF DEFENDANT OPPENHEIMER & CO., INC. FOR SUMMARY JUDGMENT

Kirk Wright allegedly operated International Management Associates, LLC ("IMA") and affiliated entities as a Ponzi scheme. Mr. Wright opened a brokerage account with the defendant Oppenheimer & Co. ("Oppenheimer") in the name of IMA and transferred funds of IMA to the account to engage in securities trades.

IMA's Trustee (the "Trustee")[1] alleges that IMA made transfers to the brokerage account in the year preceding its bankruptcy in the total amount of $ 6,640,000 with the actual intent to hinder, delay, or defraud IMA's creditors and seeks to recover them pursuant to 11 U.S.C. § 548(a)(1)(A).[2]  To establish IMA's

---

[1] William F. Perkins is the Plan Trustee for International Management Associates, LLC and affiliated entities under the Plan of Reorganization (Case No. 06-62967-pwb, Doc. 401) that the Court confirmed. (Case No. 06-62967-pwb, Doc. 669). Under the Plan, the Trustee has the rights of a trustee under the Bankruptcy Code to assert claims of the consolidated estates for the recovery of avoidable transfers.

The substantively consolidated cases pursuant to the Court's Order entered on April 17, 2008 (Case No. 06-62967-pwb, Doc. 607) are:  International Management Associates, LLC, Case No. 06-62966-pwb; International Management Associates Advisory Group, Case No. 06-62967-pwb; International Management Associates Platinum Group, Case No. 06-62968-pwb; International Management Associates Emerald Fund, Case No. 06-62969-pwb; International Management Associates Taurus Fund, LLC, Case No. 06-62970-pwb; International Management Associates Growth & Income Fund, LLC, Case No. 06-62971-pwb; International Management Associates Sunset Fund, LLC, Case No. 06-62972-pwb; IMA Real Estate Fund, LLC, Case No. 06-62974-pwb; Platinum II Fund, LP. Case No. 06-62975-pwb; Emerald II Fund, LP. Case No. 06-62976-pwb.

[2] The claims under 11 U.S.C. § 548(a)(1)(A) are limited to transfers within a year

2

of the bankruptcy filing because the cases were filed prior to the effective date of the amendment to § 548 in 2005 in the Bankruptcy Abuse Prevention and Consumer Protection Act that extended the time for the avoidance of fraudulent transfers to those made within the two years preceding the filing date.

The Trustee also sought recovery from Oppenheimer and other defendants that occurred more than a year prior to the filing of the bankruptcy cases under 11 U.S.C. § 544(b) and the Georgia Uniform Fraudulent Transfer Act ("GUFTA"), O.C.G.A. §§ 18-2-70 *et seq*. The other defendants are Lehman Brothers, Inc. ("Lehman"), J.B. Oxford & Company ("Oxford"), Banc of America Securities, LLC ("BOA Securities"), and TD Ameritrade, Inc. ("TD Ameritrade").

Lehman was a debtor in a liquidation case under the Securities Investor Protection Act of 1970 and, therefore, this action against it was stayed under 15 U.S.C. § 78eee(b)(2)(B) and 11 U.S.C. § 362(a). Oxford has been served but has not answered. The Trustee has not pursued the claims against Lehman and Oxford in this proceeding.

All of the defendants except Lehman and Oxford filed motions for summary judgment that the Court granted on April 20, 2011. [149]. Pursuant to Fed. R. Civ. P. 54(b), *applicable under* Fed. R. Bankr. P. 7054, the Court entered final judgment in their favor. [150].

The Court ruled that no transfers had occurred for purposes of § 548(a)(1)(A) or GUFTA because IMA maintained control over the funds. Alternatively, the Court ruled that the "stockbroker defense" of 11 U.S.C. § 546(e) barred avoidance of any transfers under GUFTA because they must have been made as margin payments, settlement payments, or to purchase securities. The stockbroker defense, however, does not apply to claims under § 548(a)(1)(A).

On appeal, the District Court affirmed the applicability of the stockbroker defense to the GUFTA claims. *Perkins v. Lehman Brothers, Inc. (In re International Management Associates, LLC)*, Civ. Action No. 1:11-CV-1806, 2012 WL 11946959 at *10 (N.D. Ga. Mar. 30, 2012) (Pannell, D.J.). Because the Trustee did not assert any claims against BOA Securities and TD Ameritrade under § 548(a)(1)(A), the affirmance resolved all claims against them.

The District Court reversed this Court's ruling on the transfer issue, however, and remanded for further proceedings with regard to the § 548(a)(1)(A) claim against Oppenheimer. Citing the Eleventh Circuit's decision in *Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312 (11th Cir. 2010), the District Court

actual fraudulent intent, the Trustee relies primarily on the so-called Ponzi scheme

presumption.  The presumption is that "transfers made in furtherance of [a Ponzi]

scheme are presumed to have been made with the intent to defraud for purposes of

recovering the payments under [§ 548(a)(1)(A)]." *Perkins v. Haines (In re*

*International Management Associates, LLC),* 661 F.3d 623, 626 (11th Cir. 2011).

This Order addresses three defenses that Oppenheimer raises in its motion

for summary judgment [228] and supporting brief [229].

First, Oppenheimer contends that the Trustee has not produced evidence that

IMA made the transfers with the required actual intent to hinder, delay, or defraud

creditors.  This defense requires the Court to examine the scope of the Ponzi

scheme presumption and determine whether it applies in a fraudulent transfer

action when, as here, the debtor makes the transfers for contemporaneous and

equivalent value to a third party who is not an investor in the scheme and did not

participate in it.  If the presumption is not available, then the Court must determine

---

determined that "[c]ontrol by the defendants over fraudulently-transferred funds is
an element of the **exception** to liability under [11 U.S.C.] § 550(a), not the analysis
to determine whether an avoidable transfer occurred under § 548 (or § 544 and
GUFTA) in the first place." *Perkins*, 2012 WL 11946959 at *5 (emphasis in
original).  The District Court concluded, therefore, that "the deposits from IMA to
the brokerage accounts were transfers under §§ 548(a)(1) and 544 and GUFTA."
*Id.*

As a consequence of the foregoing, the § 548(a)(1)(A) claims against
Oppenheimer are the only remaining claims that the Trustee is currently pursuing
in this proceeding.

whether evidence exists that shows as a matter of fact and law that IMA made the transfers with the actual fraudulent intent that § 548(a)(1)(A) requires.

In Part II, the Court concludes that, under the circumstances here, the transfers as a matter of law were not "in furtherance of" the Ponzi scheme and that, therefore, the Ponzi scheme presumption does not apply.  Part II further concludes that, in the absence of the Ponzi scheme presumption, the Trustee's evidence is insufficient as a matter of law to prove that IMA made the transfers with the actual intent to hinder, delay, or defraud creditors.

Oppenheimer's second defense is based on the undisputed fact that the transfers did not diminish IMA's estate or otherwise harm IMA's creditors.  IMA's theory is that depletion or diminution of the debtor's estate is an essential element for avoidance of a fraudulent transfer under § 548(a)(1)(A).  In Part III, the Court concludes that it must deny summary judgment on this ground because a transfer may be avoidable under § 548(a)(1)(A) even if it was for contemporaneous, equivalent value.

Oppenheimer's third defense is the affirmative defense of § 548(c).  Section 548(c) provides a complete defense to Oppenheimer if IMA received value in exchange for the transfers and Oppenheimer received them in good faith.  It is undisputed that IMA received value.  Part IV explains the Court's conclusion that the undisputed material facts establish that Oppenheimer's conduct satisfies the

good faith requirement under a subjective test of good faith that applies here.

The Court will, therefore, grant summary judgment in favor of Oppenheimer based on the absence of evidence to create disputes of material fact with regard to IMA's actual fraudulent intent and Oppenheimer's good faith and will deny summary judgment on its defense that a transfer for equivalent and contemporaneous value cannot be a fraudulent transfer under §548(a)(1)(A).[3]

# I. Undisputed Material Facts and Contentions of the Parties

The evidence in the record consists of depositions, declarations of fact, expert opinions, and documentary evidence. The parties draw competing inferences from the evidence. Oppenheimer sets forth its version in its Statement of Undisputed Material Facts ("D. SUMF") [228] filed in support of its summary judgment motion. The Trustee sets forth his views in his Response to

---

[3]This adversary proceeding arises under Title 11 of the United States Code and in a case under Title 11 such that jurisdiction in the District Court exists under 28 U.S.C. § 1334(b). It is a core proceeding because it seeks the avoidance of fraudulent transfers. 28 U.S.C. § 157(b)(2)(H). This Court has authority to hear and determine this proceeding and enter orders and judgments by reference from the District Court under 28 U.S.C. § 157(b)(1) and LR 83.7, ND Ga. This Court thus has the authority to grant or deny Oppenheimer's motion for summary judgment.

Both the Trustee and Oppenheimer have demanded a jury trial. Trustee's Jury Demand [41]; Oppenheimer's Answer at 15 [94]. Oppenheimer is entitled to a jury trial. *Granfinanciera v. Nordberg*, 492 U.S. 33, 36 (1989). The District Court ordinarily conducts jury trials. *See* Fed. R. Bankr. P. 9015.

Oppenheimer's Statement ("T. Response") [242] and in his Statement of

Additional Material Facts ("T. SAMF") [240].

This Part summarizes the undisputed facts about IMA, its Ponzi scheme, and

its brokerage account with IMA. Later Parts discuss the evidence regarding IMA's

intent to defraud (Part II) and Oppenheimer's good faith (Part IV).

Kirk Wright was the principal of IMA and its affiliates who are the Debtors

in these consolidated cases. He purported to operate IMA as an investment

advisory service that offered investments to clients in hedge funds, structured as

limited liability companies or limited partnerships. Mr. Wright solicited

investments in the hedge funds from investors with representations that they would

receive returns on their capital contributions from the trading activities of the

hedge funds.

In reality, beginning in October 1997, Mr. Wright ran IMA and the affiliates

as a "Ponzi" scheme until it collapsed in February 2006.[4]  IMA reported fictitious

profits to the investors and used capital contributions from later equity investors to

---

[4] For purposes of Oppenheimer's motion, the Court assumes that Kirk Wright
operated IMA and the other Debtors as a Ponzi scheme. Although Oppenheimer
has not formally conceded the point, the Trustee's evidence (T. SAMF ¶12; see
also *id.* ¶¶ 1-11) establishes the existence of a Ponzi scheme beginning in October
1997 and ending in February 2006. Indeed, the Court made such a finding in
related adversary proceedings consolidated for trial on that issue based on that
evidence. (T. SAMF ¶ 13). The Eleventh Circuit affirmed the Court's ruling.
*Curtis v. Perkins (In re International Management Associates, LLC)*, 781 F.3d
1262 (11th Cir. 2015).

pay earlier investors more than their equity investments were actually worth because the profits were fictitious.

The Trustee originally was appointed as the receiver for IMA, first in a state court action filed by investors and then in an action filed by the Securities and Exchange Commission.  In his capacity as receiver, he filed Chapter 11 cases on behalf of IMA and its affiliates on March 16, 2006.  He became the Chapter 11 trustee in the cases and the Plan Trustee under the confirmed plan in the substantively consolidated cases.[5]  The Trustee has prosecuted over 100 adversary proceedings against investors to recover fictitious profits as fraudulent transfers under 11 U.S.C. § 548(a).[6]

During the operation of the Ponzi scheme, in May 2002, Mr. Wright opened a brokerage account at Oppenheimer in the name of International Management Associates.  (D. SUMF ¶ 7; see also D. SUMF ¶¶ 8-19).  The Account Agreement granted Oppenheimer a security interest in all property in the account, authorized IMA to buy and sell stocks and options on margin, required IMA to maintain margin levels as required by Oppenheimer, and gave Oppenheimer the right to transfer securities and other property held by it between or among IMA's accounts

---

[5] See *supra* note 1.

[6] See *In re International Management Associates, LLC*, 2009 WL 6506657 (Bankr. N.D. Ga. 2009), *aff'd sub nom. Perkins v. Haines (In re International Management Associates, LLC)*, 661 F.3d 623 (11th Cir. 2011).

8

as Oppenheimer deemed necessary.  (D. SUMF ¶ 12).   Oppenheimer did not

recommend any securities transactions and did not solicit any transactions.

(D. SUMF ¶¶ 47-48).

Mr. Wright transferred money to the Oppenheimer account by wire transfer

from an IMA bank account at Bank of America (D. SUMF ¶ 32), and

Oppenheimer transferred cash withdrawals to an IMA bank account at Bank of

America.  (D. SUMF ¶ 33).  All cash deposits to the account could be used to pay

for a securities purchase, to satisfy a margin requirement, to satisfy a maintenance

margin, or to reduce a debit balance in the account.  (D. SUMF ¶ 26).

From the inception of the account in May 2002 until the collapse of the

Ponzi scheme in January 2006, IMA bought securities in the amount of

$ 278,365,821.53 and sold securities in the amount of $ 273,933,866.70, for a net

loss of $ 4,431,954.83.  (D. SUMF ¶ 27).  All of the transactions reflected market

prices.  (D. SUMF ¶ 35).

In the year preceding the bankruptcy filing on March 16, 2006, cash deposits

into the Oppenheimer account were $ 6,640,000, and cash withdrawals were

$ 4,230,000.  (D. SUMF ¶¶ 30, 33).  All of the deposits were for one or more of the

purposes set forth above.  (D. SUMF ¶ 31).  At the time of the bankruptcy filing,

the balance in the Oppenheimer account was $ 85.96.[7]

---

[7] Exhibit 5 to Declaration of Lawrence Spaulding, at 81 [100-9].

Oppenheimer had no actual knowledge of the Ponzi scheme (D. SUMF ¶ 92). It did not know of the false claims Mr. Wright made regarding IMA's investment returns or that the actual amount under investment with IMA was lower than Wright claimed. (D. SUMF ¶ 69). IMA did not use the Oppenheimer name in recruiting new customers (D. SUMF ¶ 57), and no evidence exists that Mr. Wright shared Oppenheimer account statements with IMA's investors or potential investors or discussed the account with any third parties. (D. SUMF ¶ 60).

The Trustee asserts that evidence in the record is sufficient to require application of the Ponzi scheme presumption to establish IMA's actual fraudulent intent. Alternatively, the Trustee contends that issues of material fact exist with regard to IMA's intent. Oppenheimer contends that the presumption does not apply because the transfers were not in furtherance of the Ponzi scheme and that the undisputed facts do not otherwise establish actual fraudulent intent. Part II discusses the facts and law regarding these issues.

The Trustee contests Oppenheimer's § 548(c) affirmative defense on the ground that disputes of material fact exist regarding Oppenheimer's good faith.[8] The Trustee relies on evidence that shows the existence of a number of "red flags" with regard to the brokerage account that put Oppenheimer on inquiry notice of IMA's fraudulent conduct such that it cannot establish its good faith because it

_____

[8] The Trustee agrees that IMA received value for the transfers.

10

made no inquiry.  The Court discusses this evidence in Part IV in connection with

its consideration of Oppenheimer's good faith defense.

# II.  Existence of Actual Intent to Hinder, Delay, or Defraud Creditors

## A.  Introduction to the Ponzi scheme presumption and facts material to its application

To avoid the transfers to the Oppenheimer account under § 548(a)(1)(A), the

Trustee must show that IMA made the transfers "with actual intent to hinder,

delay, or defraud any entity to which the debtor was or became, on or after the date

that such transfer was made . . . , indebted."  11 U.S.C. § 548(a)(1)(A).

To establish the requisite intent, the Trustee relies in the first instance on the

so-called Ponzi scheme presumption.  The Eleventh Circuit stated the Ponzi

scheme presumption in *Perkins v. Haines (In re International Management*

*Associates, LLC)*, 661 F.3d 623, 626 (11th Cir. 2011):  "With respect to Ponzi

schemes, transfers made in furtherance of the scheme are presumed to have been

made with the intent to defraud for purposes of recovering the payments under

§§ 548(a) and 544(b)."  *Accord, Wiand v. Lee,* 753 F.3d 1194 (11th Cir. 2015)

(applying the Ponzi scheme presumption in a fraudulent transfer action brought by

a receiver under Florida's Uniform Fraudulent Transfer Act).

The dispute here is the role that the Ponzi scheme presumption plays when a debtor makes transfers for contemporaneous and equivalent value to an unaffiliated third party such as Oppenheimer who is not an investor in the scheme and did not participate in it.  The legal question is whether such a transfer is "in furtherance of" the Ponzi scheme, a requirement for application of the presumption.

The Trustee views the evidence as showing that the transfers were part of the Ponzi scheme and in furtherance of it because they were necessary to keep the scheme on-going, to perpetuate the continuance of the fraud, and to prevent its discovery.[9]

The Trustee observes that IMA's Ponzi scheme depended on IMA's appearance as a successful investment advisory firm and that this appearance required Mr. Wright to have officers, employees, bank accounts, lawyers and other professionals, and relationships with stockbrokers to conduct trading.  Thus, the Trustee concludes, "Trading with Oppenheimer was part of the façade of a successful investment advisory business and necessary for the continuation of the Ponzi scheme."  (T. SAMF ¶ 25; see also *id.* ¶¶ 26, 27).

In addition, the Trustee points out that the transfers to Oppenheimer were necessary to prevent IMA employees, lawyers, and accountants from discovering

---

[9] Plaintiff William F. Perkins' Response to Oppenheimer & Co., Inc.'s Second Motion for Summary Judgment ("Trustee Brief") at 7-12.  [241].

12

the Ponzi scheme.  By May 2005, the only brokerage account that IMA had was the Oppenheimer account.  Because no IMA employees could access Oppenheimer account statements, Mr. Wright by maintaining the Oppenheimer account could claim that he was making high returns that would attract new investors.  Without the transfers to the Oppenheimer account, the Trustee reasons, employees and professionals with no knowledge of the fraud would have realized that the returns Mr. Wright claimed were nonexistent and that a Ponzi scheme was underway, resulting in its exposure and collapse.  (T. SAMF ¶¶ 26-27).

The Trustee argues that Mr. Wright used the Oppenheimer account specifically to prevent disclosure of the Ponzi scheme during 2005.  At the insistence of two IMA employees, Drs. Fitz Harper and Nelson Bond, IMA had opened an account at Lehman Brothers in early 2005 that would be transparent and to which they would have access.  (T. SAMF ¶ 14-15).  Trading results in this account were reviewed and confirmed by a third-party administrator, and an accounting firm would produce audited accounting records for the first time. (T. SAMF ¶ 16).

Trading in the Lehman account in early 2005 resulted in losses of over $ 13 million in a short time.  Because Mr. Wright could not continue to assert the high returns necessary for continuation of the Ponzi scheme if trading results were transparent and audited, Mr. Wright claimed that Lehman had erred in executing

trades and moved the money to the Oppenheimer account, to which only he had access.  (T. SAMF ¶¶ 16-17).

The Trustee concludes that this evidence shows that the transfers to the Oppenheimer account were in furtherance of the Ponzi scheme such that the Ponzi scheme presumption applies to establish IMA's actual intent to defraud.[10]

The Trustee further contends that, even if the Ponzi scheme presumption does not apply, his evidence is sufficient to permit a jury to find that IMA transferred the funds to Oppenheimer to prevent discovery of the fraud.[11]

Oppenheimer argues that the same evidence establishes as a matter of law that the transfers were outside the scheme and were not in furtherance of it because they were not necessary to keep it on-going and did not perpetuate it.[12]

The legal question before the Court is whether the Trustee's evidence, as a matter of law, is sufficient to permit a reasonable jury to find that IMA actually intended to hinder, delay, or defraud creditors, as § 548(a)(1)(A) requires, by application of the Ponzi scheme presumption or otherwise.

The Court begins its analysis of the role of the Ponzi scheme presumption and what constitutes "actual intent to hinder, delay or defraud creditors" with a

---

[10] Trustee Brief [241] at 7-10.

[11] Trustee Brief [241] at 10-11.

[12] Brief in Support of Second Motion for Summary Judgment by Defendant Oppenheimer & Co., Inc. ("Oppenheimer Brief") at 2, 8-13.  [230].

review of general principles underlying fraudulent transfer law and how they have
been applied in Ponzi scheme cases.

## B.  Principles of fraudulent transfer law

When a Ponzi scheme collapses — as it inevitably must — the fraudulent
enterprise invariably has minimal assets left to pay the massive claims of
defrauded victims.  The enterprise has used the substantial sums acquired from
defrauded investors to pay early investors (often with substantial profits), to fund
the perpetrator's often lavish lifestyle, and, sometimes, to make ill-considered
investments that result in substantial losses instead of gains.

Once the fraud is uncovered, the enterprise typically ends up either in a
bankruptcy case or in a federal receivership in an action brought by the Securities
and Exchange Commission.  The only significant sources of  money to pay
defrauded investors are recoveries of payments to earlier investors and others as
fraudulent transfers and, in bankruptcy cases, as avoidable preferences under 11
U.S.C. § 547.

The Bankruptcy Code in § 548 provides for the recovery of fraudulent
transfers as a matter of federal bankruptcy law.  In addition, § 544(b) permits the
trustee to avoid transfers that are fraudulent under applicable state law.  Many
states, including Georgia, have adopted the Uniform Fraudulent Transfer Act.[13]

---

[13] Forty-three states, the District of Columbia, and the Virgin Islands have adopted

The UFTA replaced the earlier Uniform Fraudulent Conveyances Act ("UFCA") and is derived from the provisions of § 548.[14]  Federal courts generally conclude that decisions involving the UFTA are persuasive authority in § 548 cases and vice versa.[15]  The dispute here involves only § 548.[16]

Section 548(a)(1) permits a bankruptcy trustee to avoid two types of what are called "fraudulent transfers."  First, subparagraph (A) of § 548(a)(1) permits the avoidance of a transfer that the debtor makes with the actual intent to hinder, delay, or defraud a creditor.  Such transfers are called "actually fraudulent" transfers.

In addition, subparagraph (B) provides for the avoidance of what are called

---

the UFTA.  New York and  Maryland adopted the predecessor of the UFTA, the Uniform Fraudulent Conveyances Act ("UFCA") but have not enacted UFTA. Alaska, Kentucky, Louisiana, South Carolina, and Virginia have not adopted either the UFCA or the UFTA.  5 COLLIER ON BANKRUPTCY ¶ 548.01[2][a] (Resnick & Sommer eds., 16th ed.) [hereinafter "COLLIER ON BANKRUPTCY"]; *see also id.* ¶ 548.01B (listing of state laws adopting UFTA).

[14] The UFTA differs in some respects from § 548.  *See* 5 COLLIER ON BANKRUPTCY ¶ 548.01[2][a][i]; *see also id.* ¶ 548.01A (comparison of major provisions of § 548, UFTA, and UFCA).

[15] *E.g.*, *Klein v. Cornelius*, 786 F.3d 1310, 1320 (10th Cir. 2015); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 194 (5th Cir. 2013); *Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Technology Group, Inc.)*, 916 F.2d 528, 534 (9th Cir. 2011); *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.*), 139 F.3d 574, 577  (7th Cir. 1998).

[16] As note 2 *supra* discusses, the Court previously ruled — and the District Court affirmed — that the "stockbroker defense" of § 546(e) precludes recovery of the transfers under § 544(b) and Georgia's UFTA.

"constructively fraudulent" transfers. These are transfers that are conclusively presumed to be fraudulent without regard to the debtor's — or anyone else's — intent, fraudulent or otherwise.

A transfer is constructively fraudulent if it meets two requirements.

First, the transfer must be made for less than "reasonably equivalent value." § 548(a)(1)(B)(i). "Value" includes the satisfaction of an existing debt; if a debtor pays a valid debt that is reasonably equivalent to the value of the transfer, it is not constructively fraudulent. § 548(d)(2)(A).

Second, one of four circumstances must exist. § 548(a)(1)(B)(ii) Three of them describe distressed financial situations of the debtor: (1) the debtor is insolvent (or rendered insolvent as a result of the transfer); (2) the debtor was engaged in, or was about to engage in, a business or transaction for which any property remaining with the debtor was an unreasonably small capital; or (3) the debtor intended to incur, or believed that it would incur, debts that the debtor could not pay as they matured. § 548(a)(1)(B)(ii)(I) – (III).[17]

---

[17] A fourth circumstance does not relate to the financial situation of the debtor. Section 548(a)(1)(B)(ii)(IV) provides for avoidance of a transfer for less than reasonably equivalent value if the debtor made the transfer to or for the benefit of an insider under an employment contract and not in the ordinary course of business. The provision was added in 2005 by the Bankruptcy Abuse and Consumer Protection Act and, unlike the other three provisions, does not have its roots in traditional fraudulent conveyance law. See 5 COLLIER ON BANKRUPTCY ¶ 548.12[13] at 548-134.

Fraudulent transfer law has its origins in sixteenth century England.  The

Statute of Fraudulent Conveyances, 13 Eliz., Ch. 5 (1571), provided in pertinent

part "[f]or the avoiding and abolishing of feigned, covinous and fraudulent"

conveyances "to the end, purpose, and intent to delay, hinder or defraud creditors

. . . of their just and lawful actions, suits, debts . . . and reliefs" to the "hindrance of

the due course and execution of law and justice."[18]  In the absence of direct proof

---

[18] Expert Report of Ralph Brubaker at 1 [205-1 at 11] (hereinafter "Brubaker
Report") (quoting 13 Eliz., Ch. 5 (1571) *as reprinted in* 2 GLENN, FRAUDULENT
CONVEYANCES AND PREFERENCES (rev. ed. 1940)).

Oppenheimer retained Professor Ralph Brubaker to provide expert opinions
regarding the historic and statutory origins and evolution of the Ponzi presumption
of fraudulent intent.  Oppenheimer filed his report with the Court. [205].  Professor
Brubaker is a Professor of Law at the University of Illinois College of Law in
Champaign, Illinois.  Professor Brubaker teaches courses in bankruptcy,
bankruptcy procedure, corporate reorganization, civil procedure, contracts, and
conflicts of law.  Brubaker Report at ii-vi [205-1 at 3-7].

The Trustee moved to strike his report on the grounds that his reasoning is
wrong and contrary to well-settled Eleventh Circuit precedent and that his report
violates Fed. R. Evid. 702.  [206].  With regard to Rule 702, the Trustee noted that
Professor Brubaker's testimony would be "nothing more than bare legal
conclusions that would invade the distinct and exclusive province of the Court to
rule on issues of law and to instruct the jury accordingly" and that his expert
testimony would not "help the trier of fact to understand the evidence."  (Plaintiff's
Motion to Strike Report of Ralph Brubaker and to Preclude Ralph Brubaker From
Testifying as an Expert and Incorporated Memorandum of Law at 3 [206]).

The Court ruled that the motion to strike should be granted to the extent that
it sought to preclude Professor Brubaker's testimony at trial but deferred entry of
an Order to that effect.  Instead, the Court stated that it would make the ruling in
connection with its consideration of any motions for summary judgment that the
parties file or when the proceeding is ready for transfer to the District Court for
jury trial (see *supra* note 3) so that the District Court could review the Court's

of actual intent to defraud — usually unavailable given the likelihood that the

participants in the transaction would deny any such state of mind — courts

permitted an inference of actual fraudulent intent to be drawn from specified

circumstances that indicated fraudulent intent.  These circumstances became

known as "badges of fraud."[19]

The concept of constructive fraud developed in cases in which courts

construed the actual intent language of the Statute of Elizabeth to presume fraud,

without proof of actual fraudulent intent, when a debtor transferred property for

less than reasonably equivalent value while insolvent or nearly so.[20]  Thus, courts

determined that "voluntary transfers," *i.e.,* gifts, and transfers for inadequate

---

evidentiary ruling at that time.  (Order on Plaintiff's Motion to Strike Expert
Report and to Preclude Testimony at 5 [218]).

The Court's Order stated that Professor Brubaker's report "may be helpful to
this Court in ruling on the legal issues that may arise in the context of motions for
summary judgment."  *Id.* at 4.  Accordingly, the Court advised the parties, "The
Court may . . . refer to Professor Brubaker's analysis to the extent it is relevant to
the legal issues in this adversary proceeding in the same manner that it would
consult a law review article or legal text on the issues it discusses.  The Trustee, of
course, may submit his own legal analysis, either through argument of his counsel
or another scholar."  *Id.* at 5.

In accordance with the Court's order, the Court will enter an Order
precluding Professor Brubaker's testimony simultaneously with entry of this
Order.

[19] Brubaker Report at 1 [205-1 at 11] (citing *Twyne's Case*, 3 Coke Rep. 80b,
76 Eng. Rep. 809 (Star Chamber 1601) (relying upon six badges of fraud)); *see
also* 5 COLLIER ON BANKRUPTCY ¶ 548.04[1][a].

[20] 5 COLLIER ON BANKRUPTCY ¶ 548.01.

consideration would be presumed to be fraudulent in a financially distressed situation.[21]

The codifications of fraudulent transfer law in both § 548 and the UFTA are rooted in these concepts.[22]  Since the inception of fraudulent transfer law, its focus has been, and remains, on the avoidance of transfers that deplete the debtor's assets and place them beyond the reach of creditors.[23]

A bankruptcy trustee has an additional avoidance power, the right to recover a preference under § 547 of the Bankruptcy Code.  Section 547 permits a trustee to recover an insolvent debtor's payment to a creditor on account of an antecedent debt, made within 90 days prior to the bankruptcy filing, that results in the creditor

---

[21] Brubaker Report at 3-5 [205-1 at 12-14].  Professor Brubaker traces the development of constructive fraud as applied to gifts to *Reade v. Livingston*, 3 Johns Ch. 481 (N.Y. 1818), and as applied to transfers for inadequate consideration to *Boyd & Suydam v. Dunlap*, 1 Johns Ch. 478 (N.Y. 1815).  *See generally* John C. McCoid, *Constructively Fraudulent Conveyances:  Transfers for Inadequate Consideration,* 62 TEX. L. REV. 639 (1983).

[22] 5 COLLIER ON BANKRUPTCY ¶ 548.01[1].

[23] 5 COLLIER ON BANKRUPTCY ¶ 548.01[1][a] at 548-10, 548-11 & n. 9 (citing *Frontier Bank v. Brown (In re Northern Merchandise, Inc.)*, 371 F.3d 1056, 1059 (9th Cir. 2004) ("The primary focus of section 548 is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors.") and *In re PWS Holding Corp.*, 303 F.3d 308, 313 (3d Cir. 2002) ("Fraudulent conveyance law aims 'to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away.' ") (quoting *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFram Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000)).  *See also* cases cited *infra* note 61.

receiving more than it would have in a Chapter 7 case had the payment not been made.[24]

Unlike § 548, the preference statute permits recovery of a payment for which the debtor received reasonably equivalent value in the form of satisfaction of an existing debt.  Thus, whereas fraudulent conveyance law concerns itself with diminution of the net worth of the debtor to the detriment of all creditors generally, preference law enforces a policy of equality of distribution by putting creditors who were paid shortly before the bankruptcy filing in the same position as those who were not paid.

## C. Fraudulent transfer law in Ponzi scheme cases and development of the Ponzi scheme presumption

In Ponzi scheme cases, courts have regularly applied the *constructive* fraud provisions of § 548 (or the UFTA and its predecessors in the Bankruptcy Act and the Uniform Fraudulent Conveyance Act) to permit bankruptcy trustees to recover payments made to Ponzi investors that exceed the amount of the investor's investment.  The recoverable amount is usually referred to as "fictitious profits."

---

[24] 11 U.S.C. § 547(b)(1)-(5).  The time period is one year in the case of a transfer to an insider.  § 547(b)(4)(A).

The Eleventh Circuit summarized these principles in an appeal in other adversary proceedings in IMA's cases, *Perkins v. Haines (In re International Management Associates LLC),* 661 F.3d 623, 627 (11th Cir. 2011) (citations omitted):

> In the case of Ponzi schemes, the general rule is that a defrauded investor gives "value" to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal.  Courts have recognized that defrauded investors have a claim for fraud against the debtor arising as of the time of the initial investment.  Thus, any transfer up to the amount of the principal investment satisfies the investors' fraud claim (an antecedent debt) and is made for "value" in the form of the investor's surrender of his or her tort claim.  Such payments are not subject to recovery by the debtor's trustee.  Any transfers over and above the amount of the principal — *i.e.,* for fictitious profits — are not made for "value" because they exceed the scope of the investors' fraud claim and may be subject to recovery by a Trustee.

A trustee may recover a transfer paying an investor's principal only if it is within the applicable preference period such that § 547 is applicable or if the trustee establishes that the transfer was made with *actual* intent to hinder, delay, or defraud creditors such that § 548(a)(1)(A) is applicable.  In the preference situation, the existence of "reasonably equivalent value" (which prevents recovery of the transfer as a *constructively* fraudulent transfer) provides no defense to the

22

preference action.  In the fraudulent transfer situation, the investor may defend on the basis of reasonably equivalent value but must also establish that it took the transfer in "good faith."  § 548(c).

Recall that the law of actual fraudulent transfers focuses on the debtor's intent to hinder, delay, or defraud creditors by removing assets from their reach and diminishing the debtor's net worth.  The payment of a particular debt as opposed to others — a *preferential* transfer — does not remove an asset from all creditors but only some of them.  The payment of a valid debt, in other words, cannot be said to be made with the intent to defraud creditors because its very purpose is to pay a creditor.

In Ponzi scheme cases, however, courts have developed a different conception of actual intent to hinder, delay, or defraud creditors.  Rather than considering whether the debtor intended to *remove* assets from the reach of creditors, courts have concluded that the requisite actual fraudulent intent is the perpetrator's intent to induce future investors to put money *into* the debtor.

The reasoning is that a Ponzi scheme necessarily involves fraud on future investors and that the perpetuation of the fraud requires payments to earlier investors.  Payments to earlier investors are critical to the Ponzi scheme because investors who do not get paid can be expected to file lawsuits or otherwise take actions that will bring the fraudulent operation to light and bring it to an end.

Consequently, because a Ponzi scheme inherently requires payments to earlier

investors in order to perpetuate the Ponzi scheme, courts have concluded that such

payments are made with actual intent to defraud.

This is the "Ponzi scheme presumption." Simply put, the rule is that the

proof of the existence of a Ponzi scheme is sufficient to prove that a transfer made

in furtherance of the Ponzi scheme was made with actual fraudulent intent.

The doctrine has its origins in a 1966 decision of the Sixth Circuit in *Conroy*

*v. Shott*, 363 F.2d 90 (6th Cir. 1966), and a 1987 en banc ruling of the United States

District Court for the District of Utah in *Merrill v. Abbott (In re Independent*

*Clearing House Co.)*, 77 B.R. 843 (D. Utah 1987), usually cited as *Independent*

*Clearing House*.

*Conroy v. Shott,* 363 F.2d 90 (6th Cir. 1966), involved a bankruptcy trustee's

fraudulent transfer action against a Ponzi investor to recover payments under

Ohio's fraudulent conveyance law. Because Ohio had not yet enacted the Uniform

Fraudulent Conveyance Act, Ohio law did not provide for the recovery of a

payment to earlier investors as a constructively fraudulent transfer. The only

available theory of recovery under Ohio's fraudulent transfer law was an action

based on actual intent to defraud. The Ohio statute provided, "Every gift, grant, or

conveyance of lands, tenements, hereditaments, rents, goods, or chattels, . . . made

or obtained with intent to defraud creditors of their just and lawful debts or

damages, or to defraud or to deceive the persons purchasing such lands, tenements,
hereditaments, rents, goods, or chattels, is void." *Id.* at 91 (ellipsis in original)
(quoting former OHIO REV. CODE § 1335.02).

The Sixth Circuit in *Conroy v. Shott* largely quoted from and adopted the
ruling of the district court that had granted summary judgment to the trustee on the
issue of liability of a Ponzi scheme investor for receipt of a fraudulent transfer.
With regard to the issue of actual fraudulent intent, the Sixth Circuit quotes
portions of the district court's opinion, including the following, *Conroy,* 363 F.2d
at 92:

> It will be immediately noted than an intent to defraud on the part of
> [the debtor operating the Ponzi scheme] must first be presumed to
> have existed, but a quick review of the facts clearly establish that no
> doubt as to such intent can exist.  [The debtor's] scheme was the
> essence of simplicity, not to say of stupidity.  At its inception he
> borrowed from A, then borrowed from B to repay A.  The inducement
> to B was a high rate of interest on a short term, whereupon it became
> necessary to borrow from C to repay B.  This operation continued,
> with ever increasing rates of interest and shortening of the loan
> periods until hundreds of transactions involving millions of dollars
> had been entered into by [the debtor].  However, since he was
> insolvent from the moment of the making of the first loan, and since
> there has never been a suggestion that any source of income existed
> except new loans (if such may be considered "a source of income"),
> the question of intent to defraud is not debatable.

The Utah en banc district court provided a clearer rationale in the context of the fraudulent transfer provisions of § 548 and the Utah Uniform Fraudulent Transfer Act in *Merrill v. Abbott (In re Independent Clearing House Co.),* 77 B.R. 843 (D. Utah 1987).

After concluding that the undisputed facts established that the debtors operated a Ponzi scheme, the court noted that § 548(a)(1)(A)[25] includes transfers that a debtor makes with the actual intent to hinder, delay, or defraud *future* creditors as well as existing ones. *Independent Clearing House*, 77 B.R. at 860. The court then reasoned, "[I]f, at the time the debtors made transfers to earlier [investors] they had the actual intent to hinder, delay or defraud later [investors], transfers to earlier [investors] may be fraudulent within the meaning of section [548(a)(1)(A)]." *Id.*

The court concluded that an inference of intent to defraud future investors can arise from the mere existence of a Ponzi scheme and that, "[i]ndeed, no other reasonable inference is possible." *Independent Clearing House,* 77 B.R. at 860.

The court explained, *id.*:

A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the inability to

---

[25] At the time of the decision, the provision was numbered as § 548(a)(1).

attract new investors.  The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors.  He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf.* Restatement (Second) of Torts § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.  *Cf. Coleman v. Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.),* 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § [548(a)(1)(A)]).

The *Independent Clearing House* court concluded, 77 B.R. at 860-61:

Although the question of the debtors' intent would ordinarily present a factual question, we conclude that, from the undisputed evidence in the record, only one inference is possible – namely, that the debtors had the intent to hinder, delay or defraud creditors.  The trustee's undisputed evidence is that the debtors were engaged in a Ponzi scheme and therefore must have known that [investors] at the end of the line would lose their money.  That is the only evidence there is.  We conclude that it was sufficient to establish, as a matter of law, the debtors' actual intent to hinder, delay, or defraud creditors within the meaning of section [548(a)(1)(A)].

The only authority the *Independent Clearing House* court cited for its

conclusion was the Sixth Circuit's ruling in *Conroy v. Shott.*

These two cases do not describe their rulings or rationales in terms of a

"Ponzi scheme presumption."  Nevertheless, circuit courts have relied on them to

establish what has become the "Ponzi scheme presumption."  Under these rulings,

proof of a Ponzi scheme establishes a presumption of actual intent to hinder, delay

or defraud creditors within the meaning of § 548(a)(1)(A).

In addition to the Sixth Circuit in *Conroy v. Shott,* the Fifth,[26] Ninth,[27]

---

[26] *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).  Cases in the Fifth Circuit routinely cite *Warfield v. Byron* as establishing the Ponzi scheme presumption in the circuit.  *E.g.*, *Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 712 F.3d 185, 195-96 (5th Cir. 2013); *Am. Cancer Soc. v. Cook*, 675 F.3d 524, 527 (5th Cir. 2012); *Janvey v. Alguire*, 647 F.3d 585, 598-99 (5th Cir. 2011)*; SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007).

The only authority that *Warfield v. Byron* cites for the conclusion that proof of a Ponzi scheme establishes actual fraudulent intent is *Scholes v. Lehman*, 56 F.3d 750, 757 (7th Cir. 1995).  *Scholes v. Lehman* does not refer at all to the Ponzi scheme presumption, and its only ruling with regard to actual intent to defraud was to remand for a factual determination of whether it existed.

The plaintiff in *Scholes v. Lehman* was a federal receiver appointed for several corporations after the collapse of a Ponzi scheme that an individual operated through the corporations.  The district court granted summary judgment in favor of the receiver on his claims to recover fraudulent transfers under pre-UFTA Illinois law against an investor, the perpetrator's ex-wife, and religious institutions.

The court framed the issue as "whether the transfers should be deemed to fall outside the [fraudulent conveyance] statute because they were supported by sufficient consideration."  *Scholes*, 56 F.3d at 755.  Noting that the statute reaches "fraud in fact" ("actual fraud") and "fraud in law" ("constructive fraud"),  the court

stated that, if the receiver proved fraudulent intent under the UFTA that Illinois later adopted, and thus "fraud in fact," "then explicitly under the new statute as implicitly under the old the transfer is deemed fraudulent even if it is in exchange for 'valuable' consideration." *Id.* at 757.

The *Scholes v. Lehman* court then observed, "There almost certainly was intent to defraud here on the part of [the individual perpetrator of the Ponzi scheme] and through him the corporations, *but it is not the basis on which the receiver defends the judgment he obtained in the district court, except with regard to the transfers to the ex-wife, of which more later."  Id.* at 757 (emphasis added). The court went on to rule that the transfers to the investor to the extent of fictitious profits and to the religious organizations for donations they received were not for full consideration.  The court therefore affirmed the grant of summary judgment against the investor and the religious organizations based on the existence of "fraud in law" (constructive fraud).

The *Scholes v. Lehman* court reversed the grant of summary judgment on the claims against the ex-wife and remanded for factual determinations concerning the validity and amount of her claims for support, whether the transfers were made with actual intent to defraud, and, if so, whether she knew or should have known of the fraudulent intent.  *Id.* at 759.  The court explained that the ex-wife was entitled to prove the validity and amount of her claims for support in response to the receiver's "fraud in law" theory and that the receiver could recover only the transfers that exceeded the legal obligations that the individual and the corporations had to her.  *Id.* The court declined to affirm the grant of summary judgment against her based on "fraud in fact," concluding that the evidence before the district court did not show as a matter of law that "fraud in fact" existed.  *Id.*  If the trial court on remand found actual fraud, the court continued, she could not keep any part of the money if she knew or should have known of the fraudulent intent.  *Id.*

[27] *Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Technology Group, Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990) (citing *Conroy v. Shott* and *Independent Clearing House*, the court stated, without elaboration, "[T]he debtor's actual intent to hinder, delay or defraud its creditors may be inferred from the mere existence of a Ponzi scheme.").  Ninth Circuit cases applying the Ponzi scheme presumption cite this case without discussion of the point.  *Barclay v. Mackenzie (In re AFI Holding, Inc.)*, 525 F.3d 700, 704 (9th Cir. 2010); *Donnell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008); *Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 814 (9th Cir. 2008).

Tenth[28] and Eleventh[29] Circuits have adopted the Ponzi scheme presumption.  They

have done so uncritically and without analysis of the fact that fraudulent

inducement — the type of fraud that underlies the presumption — differs from the

fraudulent removal of assets beyond the reach of creditors that the fraudulent

---

[28] *Klein v. Cornelius*, 786 F.3d 1310, 1320 (10th Cir. 2015) ("[B]ecause Ponzi schemes are insolvent by definition, we presume that transfers from such entities involve actual intent to defraud.").  *Accord*, *Wing v. Dockstader*, 482 F. App'x 361, 363 (10th Cir. 2012).

The unpublished ruling in *Wing v. Dockstader* cited only the Ninth Circuit's ruling in *Donnell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008).  *Donnell v. Kowell* relied on *Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Technology Group, Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990), which, in turn, cited *Conroy v. Shott* and *In re Clearing House* without elaboration.

*Klein v. Cornelius* cited only *Wing v. Dockstader*, *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014), *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013), and *SEC v. Madison Real Estate Group*, 647 F.Supp.2d 1271, 1279 (D. Utah 2009).  *Janvey* relies on cases that in turn cite *Warfield v. Byron*, 436 F.3d 551 (5th Cir. 2006), discussed *supra* note 26; *Wiand v. Lee*, discussed in later text, cites cases that, in turn, rely on *Shott v. Conroy* and *Independent Clearing House*.

*SEC v. Madison Real Estate Group* cites *Warfield v. Carnie*, 2007 WL 1112591, at * 9 (N.D. Tex. 2007).  This case relies on the Seventh Circuit's decision in *Scholes v. Lehman*, 56 F.3d 750 (7th Cir. 1995), discussed *supra* note 26, and two bankruptcy court decisions.  One of them, *In re Rodriguez*, 209 B.R. 424, 433 (Bankr. S.D. Tex. 1997), relies on *Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Technology Group, Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990) (which cited only *Conroy v. Shott* and *Independent Clearing House, see supra* note 27).  The other, *In re Randy*, 189 B.R. 425, 438-39 (Bankr. N.D. Ill. 1995), relies on the analyses in *Conroy v. Shott* and *Independent Clearing House*.

[29] *Wiand v. Lee*, 753 F.3d 1194 (11th Cir. 2015); *Perkins v. Haines (In re International Management Associates, LLC)*, 661 F.3d 623 (11th Cir. 2011).  Part II(D) discusses both cases.

transfer laws deal with.  They do so solely in reliance on *Conroy v. Shott* or

*Independent Clearing House* or on other authority that either relies only on those

decisions or does not address the Ponzi scheme presumption at all.[30]

## D.  The Ponzi scheme presumption in the Eleventh Circuit

The Ponzi scheme presumption in the Eleventh Circuit first appears in

*Perkins v. Haines (In re International Management Associates, LLC),* 661 F.3d

623 (11th Cir. 2011).   The issue before the court was whether the fact that the

investors had made investments in the form of equity in the debtors precluded them

from asserting the "for value" defense of § 548(c); the court assumed the existence

of a Ponzi scheme and the debtor's actual fraudulent intent for purposes of

resolving this single issue.

In the course of ruling that the investors could assert the defense, the court

observed in a single sentence, "With respect to Ponzi schemes, transfers are

presumed to have been made with the intent to defraud for purposes of recovering

the payments under §§ 548(a) and 544(b)."  *Perkins v. Haines,* 661 F.3d at 626.

To support this statement (which quite clearly is dictum[31]), the court cited *Barclay*

---

[30] Cases in the Fifth, Ninth and Tenth Circuits are discussed *supra* notes 26, 27,
and 28, respectively.  Part II(D) discusses the Eleventh Circuit cases.

[31] *Perkins v. Haines* involved a direct appeal from this Court's summary judgment
ruling in related adversary proceedings that victims of IMA's Ponzi scheme could

31

*v. Mackenzie (In re AFI Holding, Inc.),* 525 F.3d 700, 704 (9th Cir. 2008), *Conroy*

*v. Shott,* 363 F.2d 90, 92 (6th Cir. 1966), and *Cuthill v. Greenmark, LLC (In re*

*World Vision Entertainment, Inc.)*, 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002).

The Ninth Circuit in *AFI Holding* stated the Ponzi scheme presumption in a

single sentence and quoted from its earlier decision in *Hayes v. Palm Seedlings*

*Partners-A (In re Agricultural Research and Technology Group, Inc.)*, 916 F.2d

528, 535 (9th Cir. 1990), which likewise stated the presumption in one sentence

and cited only *Conroy v. Shott* and *Independent Clearing House.*  The analysis in

*World Vision* was an extensive quotation from and application of *Independent*

*Clearing House.*

In a later case, *Wiand v. Lee,* 753 F.3d 1194 (11th Cir. 2015), the Eleventh

Circuit applied the Ponzi scheme presumption in a fraudulent transfer action

brought by a receiver under Florida's Uniform Fraudulent Transfer Act.  *Wiand v.*

---

invoke the "for value" defense of 11 U.S.C. § 548(c) with regard to transfers they
received to the extent of their principal investment, notwithstanding the Trustee's
contention that "value" did not exist because the investments were equity
investments in limited liability entities rather than debt.  As such, the Eleventh
Circuit assumed, for purposes of the appeal, "that all of the Debtors' transfers to
the investor defendants qualify as fraudulent transfers under § 548(a)(1)(A) and
applicable state law."  *Perkins v. Haines*, 661 F.3d at 626 (11th Cir. 2011).  This
Court made the same assumption for purposes of deciding the question of law that
the motion for summary judgment presented.  *In re International Management*
*Associates, LLC*, 2009 WL 6506657 (Bankr. N.D. Ga. 2009).  Accordingly, the
question of  IMA's intent in making the transfers was not before the Eleventh
Circuit, and its statement about the Ponzi presumption was not necessary to the
decision.

*Lee* cited rulings from the Fifth, Ninth, and Tenth circuits that applied the

presumption.[32]  The cited cases from the Ninth[33] and Tenth[34] Circuits present no

analysis of the presumption and contain only authority that, as in *Perkins v.*

*Haines,* has its ultimate origins in either *Conroy v. Shott* or *Independent Clearing*

*House.*  The Fifth Circuit cases[35] have their origin in the Seventh Circuit's opinion

in *Scholes v. Lehman*, 56 F.3d 750, 757 (7th Cir. 1995), which did not address the

Ponzi scheme presumption.[36]

The *Wiand v. Lee* court then explained that it had "embraced the so-called

'Ponzi scheme presumption' in applying the Bankruptcy Code's fraudulent transfer

provisions," citing and quoting the dictum from *Perkins v. Haines* set out above.

*Wiand v. Lee,* 753 F.3d at 1201.  The Eleventh Circuit squarely held that, under the

---

[32] 753 F.3d at 1200-01.  The court cited:  *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) (applying California UFTA); *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) (applying Texas UFTA); *Warfield v. Byron*, 436 F.3d 551, 558–59 (5th Cir. 2006) (applying Washington UFTA).  The court also cited *Wing v. Dockstader*, 482 F. App'x 361, 363 (10th Cir. 2012) (applying Utah UFTA).

[33] *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) (applying California UFTA), see *supra* note 27.

[34] *Wing v. Dockstader*, 482 F. App'x 361, 363 (10th Cir. 2012) (applying Utah UFTA), see *supra* note 28.

[35] *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) (applying Texas UFTA); *Warfield v. Byron*, 436 F.3d 551, 558–59 (5th Cir. 2006) (applying Washington UFTA).  As note  26 *supra* discusses, the court in *SEC v. Res. Dev. Int'l, LLC*, cited only *Warfield v. Byron*, which cited only *Scholes v. Lehman.*

[36] See *supra* note 26.

33

actual intent to defraud provisions of Florida's Uniform Fraudulent Transfer Act, "proof that a transfer was made in furtherance of a Ponzi scheme establishes actual intent to defraud under [FLA. STAT.] § 726.105(1)(a) without the need to consider the badges of fraud." *Id.*

Interpretations of the fraudulent transfer provisions of the Uniform Fraudulent Transfer Act inform interpretation of § 548(a) of the Bankruptcy Code.[37] Thus, the Eleventh Circuit's holding in *Wiand v. Lee* that the Ponzi scheme presumption applies in UFTA cases and its dictum in *Perkins v. Haines* that it applies in § 548(a) cases establish the availability of the Ponzi scheme presumption in the Eleventh Circuit.

The Ponzi scheme presumption arising from *Conroy v. Shott* and *Independent Clearing House* and adopted by the circuit court and lower court cases that uncritically rely on them appears to contradict long-standing principles of fraudulent transfer law. Arguably, the existence of a Ponzi scheme should not properly establish actual fraudulent intent within the meaning of the fraudulent transfer provisions in § 548(a)(1)(A) and analogous state law.[38] Indeed, the Eighth Circuit has expressly declined to rule on the issue and thus left the issue open,[39]

---

[37] *E.g.*, cases cited *supra* note 15.

[38] Professor Brubaker advances a number of criticisms of the Ponzi scheme presumption in his report. Brubaker Report [205].

[39] *Ritchie Capital Mgmt., LLC v. Stoebner*, 779 F.3d 857, 862 (8th Cir. 2015).

and the Minnesota Supreme Court has concluded that no Ponzi scheme presumption exists under Minnesota's Uniform Fraudulent Transfer Act.[40]

But whether the Ponzi scheme presumption applies in an action under § 548(a)(1)(A is not an open question for this Court.  It is clear that it does under binding Eleventh Circuit precedent.

What is not clear is when the presumption applies.  *Wiand v. Lee, Perkins v. Haines,* and lower court decisions in the Eleventh Circuit[41] and other jurisdictions[42] condition its application to transfers "in furtherance of" the Ponzi scheme.  So the controlling question here is whether the evidence in the record shows, as a matter of law, that the transfers in question were not "in furtherance of" IMA's Ponzi scheme.

---

[40] *Finn v. Alliance Bank*, 860 N.W. 2d 638, 646-47 (Minn. 2015).

[41] *E.g.*, *Welt v. Publix Super Markets, Inc. (In re Phoenix Diversified Investment Corp.)*, 2011 WL 2182881, at *3 (Bankr. S.D. Fla. 2011); *Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Financial Services, LLC)*, 2011 WL 2580763, at *5 (Bankr. M.D. Fla. 2011); *Kapila v. Integra Bank, N.A.*, 440 B.R. 569, 575 (Bankr. M.D. Fla. 2010); *Cuthill v. Greenmark (In re World Vision Entertainment, Inc.)*, 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002).

[42] *E.g.*, *Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund Ltd.)*, 397 B.R. 1, 13 (S.D.N.Y. 2007); *Wagner v. Oliva (In re Vaughan Company, Realtors)*, 500 B.R. 778, 789-90 (Bankr. D.N.M. 2013); *O'Connell v. Penson Financial Services, Inc. (In re Arbco Capital Management, LLP)*, 498 B.R. 32 (Bankr. S.D.N.Y. 2013).

## E.  Transfers "in furtherance of" a Ponzi scheme

The Eleventh Circuit has not addressed the question of when a transfer is "in furtherance of" a Ponzi scheme so that the Ponzi scheme presumption applies.  It did not have to in *Wiand v. Lee*, 753 F.3d 1194 (11th Cir. 2015), and *Perkins v. Haines (In re International Management Associates, LLC),* 661 F.3d 623(11th Cir. 2011).  Both cases involved actions to recover payments to investors, and a transfer to an investor is, by definition, in furtherance of the Ponzi scheme.  Because the presumption of fraud — in the form of fraudulent inducement — arises from the conclusion that the Ponzi scheme must collapse when current investors are not paid, a payment to a current investor is necessarily "in furtherance of" a Ponzi scheme.  By its very nature, such a payment is an inherent part of the Ponzi scheme itself and of the fraudulent inducement that it involves.

But what constitutes a transfer "in furtherance of" a Ponzi scheme is a critical question when, as here, the challenged transfers are to noninvestors.  Under the case law establishing the Ponzi presumption, this test becomes the basis for distinguishing when a Ponzi debtor makes a transfer with actual fraudulent intent and when it does not.

Courts have recognized the need to make such a distinction.  As the court stated in *Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc., (In re ATM Financial Services, LLC),* 2011 WL 2580763, at * 5 (Bankr. M.D. Fla. 2011), "The Ponzi

scheme presumption must have some limitations, lest it swallow every transfer

made by a debtor, whether or not such transfer has anything to do with the debtor's

Ponzi scheme."

The court in *DeGiacomo v. Sacred Heart University, Inc. (In re Palladino)*,

556 B.R. 10, 14 (Bankr. D. Mass. 2016),[43] similarly observed that, under too

expansive an extension of the Ponzi scheme presumption, "no one who in any way

dealt with, worked for, or provided services to the debtors could prevent avoidance

of any transfers they received.  The debtors' landlord, salaried employees,

accountants and attorneys, and utility companies that provided services to the

debtors all assisted the debtors in the furtherance of their fraudulent scheme.  In

spite of this fact, we do not think that the goods and services that these persons and

entities provided were without value or that transfers to them could be set aside as

fraudulent conveyances."

### 1. *Formulations of the "in furtherance of" requirement in the case law*

Courts have phrased the "in furtherance of" requirement in various ways.

An earlier case, *Brandt v. American Bank & Trust Company of Chicago (In re*

*Foos),* 188 B.R. 239, 244 (Bankr. N.D. Ill. 1995), *aff'd in part and rev'd in part on*

---

[43] The court quoted *Merrill v. Allen (In re Universal Clearing House Co.),* 60 B.R.
985, 999 (D. Utah 1986). The quotation from *Merrill v. Allen* occurred in the
context of an issue of reasonably equivalent value.  *Merrill v. Allen* is not the
*Independent Clearing House* opinion dealing with establishing actual fraudulent
intent in Ponzi scheme cases.

*other grounds,* 1996 WL 563503 (N.D. Ill. 1996), limited the presumption to

actions against investors.  Distinguishing *Independent Clearing House*[44] as

involving fraudulent transfer actions against Ponzi investors, the court ruled that

the presumption did not apply to payments on loans and the granting of collateral

for a loan:  "Such circumstances are significantly different from payments that are

made as part of and in furtherance of a Ponzi scheme and precludes this Court from

inferring an intent to defraud."  *In re Foos*, 188 B.R. at 244.

The *Foos* court explained, "Clearly when a debtor is operating a Ponzi

scheme he knows that he is going to defraud certain investors as sooner or later he

will run out of money.  Therefore, when an action is brought to recover payments

that were part of the Ponzi scheme it is reasonable to presume an intent to defraud.

Where, as here, however, the individual who is operating the Ponzi scheme

conducts ordinary business transactions outside of the Ponzi scheme, the basis for

presuming fraud is not present . . . ."  *Id.  See also DeGiacomo v. Sacred Heart

University (In re Palladino),* 556 B.R. 10. 13-14 (Bankr. D. Mass. 2016) (Ponzi

scheme presumption inapplicable to transfers to college to pay tuition for child of

perpetrators).

---

[44] *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 860 (D. Utah 1987), discussed *supra* pages 26-28.

More recently, however, courts have not limited the presumption to situations involving Ponzi investors.  These courts address limitations only by considering whether the transfers are "in furtherance of" the Ponzi scheme.

Courts have, for example, stated that transfers to noninvestors are "in furtherance of" a Ponzi scheme when the transfers: "somehow perpetuated" it;[45] were made "to keep the scheme on-going";[46] "perpetuate[d] the scheme [or were] necessary to [its] continuance;"[47] or were "essential to the continuation of the

---

[45] *Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Financial Services, LLC)*, 2011 WL 2580763, at *5 (Bankr. M.D. Fla. 2011) ("[T]he Court can only infer intent to defraud future purchasers when the trustee has shown the transfers at issue somehow perpetuated the debtor's Ponzi scheme.  Transfers made by the debtor unrelated to the Ponzi scheme do not warrant this inference.").  *See also Kapila v. Integra Bank, N.A. (In re Pearlman)*, 440 B.R. 569, 576 (Bankr. M.D. Fla. 2010)  (For purposes of denying motion to dismiss, allegations that repayments of bank loans "kept credit flowing and stabilized [the debtor's] fraudulent house of cards perhaps a bit longer" are sufficient to make it plausible that the payments were in furtherance of the Ponzi schemes.).

[46] *Cuthill v. Greenmark, LLC (In re World Vision Entertainment)*, 275 B.R. 641, 657 (Bankr. M.D. Fla. 2002) ("Every payment made by the debtor to keep the scheme on-going was made with the actual intent to hinder, delay, or defraud creditors, primarily the new investors.").  *See also Stoebner v. Ritchie Capital Management, L.L.C. (In re Polaroid Corp.)*, 472 B.R. 22, 41 (Bankr. D. Minn. 2012) ("[A] manifest wish by the controlling person [of the Ponzi scheme] to prolong the imposture of the Ponzi scheme" furthers it.), *aff'd on other grounds*, 779 F.3d 857 (8th Cir. 2015).

[47] *Welt v. Publix Super Markets, Inc. (In re Phoenix Diversified Inv. Corp.)*, 2011 WL 2182881, at *3 (Bankr. S.D. Fla. 2011) (Transfers in furtherance of a Ponzi scheme "are those that perpetuate the scheme, or that are necessary to the continuance of the fraudulent scheme.").

scheme" in that they were part of it.[48]

Such formulations provide an unsatisfactory basis for limiting the presumption. Every payment —to a landlord, to an employee, to a utility — "somehow perpetuates" a Ponzi scheme or "keeps it on-going" or is "necessary" or "essential" to its continuation.

The standards for determining when a transfer is "in furtherance of" a Ponzi scheme in the more recent case law do not provide any substantive limitation on the application of the presumption. They result in a rule that a transfer need be nothing more than "related to" the Ponzi scheme. Such an application of the presumption effectively creates a substantive rule of law that any transfer by a Ponzi scheme debtor is made with fraudulent intent.

The analysis must go further to find a meaningful basis for distinguishing, in the context of a transfer to a noninvestor, between a transfer that is in furtherance of a Ponzi scheme and one that is not. The proper sources for such a distinction are in the principles that underlie the Ponzi scheme presumption.

---

[48] *Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund Ltd.)*, 397 B.R. 1, 13 (S.D.N.Y. 2007). Although the court stated that transfers "in furtherance of" a Ponzi scheme must be "essential to the continuation of the scheme," it concluded that the challenged transfers met this test because they were part of it. *Id.* at 13-14.

## 2. The "in furtherance of" requirement developed from principles of the Ponzi scheme presumption

The Ponzi scheme presumption is that actual fraudulent intent — the fraudulent inducement of later investors — is presumed from the existence of a Ponzi scheme. The seminal cases of *Conroy v. Shott* and *Independent Clearing House,* discussed earlier[49] (and on which later cases uncritically rely[50]) justify this result either because a finding of fraudulent intent from the operation of the Ponzi scheme is "not debatable"[51] or because "no other reasonable inference is possible."[52] The rationale is that the presumption of fraudulent intent properly arises from the existence of the Ponzi scheme because payments to earlier investors are an inherent and integral part of the fraudulent inducement and because the fraudulent inducement cannot continue without the payments. Thus analyzed, payments to earlier investors are "in furtherance of" the Ponzi scheme.

These considerations that justify the Ponzi scheme presumption provide the basis for determining when a transfer is "in furtherance of" the Ponzi scheme, i.e., when the presumption properly applies. The same characteristics of the transfer

---

[49] *Supra* pages 24-28.

[50] *Supra pages* 28-34 and notes 26-28*.*

[51] *Conroy v. Shott,* 363 F.2d 90, 91 (6th Cir. 1997), discussed *supra* pages 24-25.

[52] *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 860 (D. Utah 1987), discussed *supra* pages 26-28.

must be present:  The transfer must be an inherent and integral part of the fraudulent inducement scheme, and the continuation of the fraudulent inducement must depend on the transfer.  Transfers that do not have these characteristics are not "in furtherance of" the Ponzi scheme.

In applying these standards, an important consideration is that the presumed fraud is fraudulent inducement.  The presumption is that the Ponzi debtor made the transfer to induce future investors to put money into the scheme.  Such a motivation logically exists only if the transfer causes future investors to invest.   A transfer that does not induce future investors is not an inherent and integral part of the Ponzi scheme, and continuation of the scheme does not depend on it.

And because the presumption arises because the presumed fraudulent intent is "not debatable" or because "no other reasonable inference is possible," the causal connection between the transfer and the inducement of future investors must be a direct and material one.  The transfer must be more than incidental to the fraudulent inducement.  It goes without saying that a Ponzi operation must have an office, employees, a telephone, a bank account, and other indicia of a legitimate business.  But the causal connection between such indicia and a decision to invest is too tenuous to permit application of a presumption.

The legal conclusion is that, if a transfer does not directly and materially induce future investors, it is not an inherent and integral part of a Ponzi scheme

and continuation of the scheme does not depend on it.  Such a transfer is not "in

furtherance of" a Ponzi scheme.   In other words, a transfer is "in furtherance of" a

Ponzi scheme only if it unquestionably, i.e., directly and materially, induces a

future investor to put money in.

## F.  Applicability of the Ponzi scheme presumption to transfers to Oppenheimer

The foregoing analysis requires the conclusion that the Ponzi scheme

presumption is not applicable to the transfers to the Oppenheimer account.  The

undisputed material facts establish that the existence of the Oppenheimer account,

and the transfers of funds to it, did not directly and materially induce future

investors to put money into the IMA Ponzi scheme. [53]  Consequently, the transfers

---

[53] The Court declines to follow cases such as *Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund Ltd.)*, 397 B.R. 1, 13 (S.D.N.Y. 2007), and *O'Connell v. Penson Financial Services, Inc. (In re Arbco Capital Management, LLP)*, 498 B.R. 32 (Bankr. S.D.N.Y. 2013).

In *Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund Ltd.)*, 397 B.R. 1, 13 (S.D.N.Y. 2007), the debtor operated a Ponzi scheme based on representations that it was conducting a profitable trading program involving the short-selling of technology stocks.  The defendant was the debtor's prime broker, and the debtor transferred money to its brokerage account with the defendant to open new trading positions and to meet margin calls.

The *Manhattan Investment Fund* court concluded that the transfers were "essential to the continuation of the scheme."  *Id.* at 13.  The court explained, *id.*:

> First, to the extent the transfers were made to open new trading positions, they were part of the overall scheme – one which, by

were not "in furtherance of" the Ponzi scheme as required for the Ponzi scheme

presumption to apply.

The transfers did not induce future investors at all. It is undisputed that IMA

---

December 1, 1998, had been fraudulent for years. Second, to the
extent the transfers were made to support open positions, they are also
clearly part of the Ponzi scheme. Because the Fund's only strategy
was to short-sell technology stocks, it had to keep its account at Bear
Stearns operational in order to survive. If it had not made the
transfers into the margin account, the Fund could have collapsed
almost immediately because Bear Stearns could have closed out its
short positions and used the money already in the account to cover its
own liabilities. Given this undisputed record, we conclude that the
transfers were "in furtherance" of the Ponzi scheme and trigger the
Ponzi scheme presumption.

*O'Connell v. Penson Financial Services, Inc. (In re Arbco Capital
Management, LLP)*, 498 B.R. 32 (Bankr. S.D.N.Y. 2013), is similar. The trustee
alleged that funds the Ponzi debtor transferred to the defendant broker were
recoverable as actually fraudulent transfers under §548(a)(1)(A) because they were
"products of the Ponzi scheme" and "enabled [the Ponzi debtor] to continue to
trade and continue to defraud [the Ponzi debtor's] creditors." *Id.* at 42. Denying
the defendant's motion to dismiss, the court ruled that the Ponzi scheme
presumption applied because the transfers "served to further the Ponzi scheme."
*Id.* (internal punctuation omitted).

For these courts, a transfer is "in furtherance of" a Ponzi scheme if it is
"essential to the continuation of the scheme" in the sense that the Trustee
advocates. Under the rulings in these cases, the Trustee's evidence is sufficient to
require denial of summary judgment.

The Court declines to apply the reasoning of these cases here. As discussed
in the text, a transfer "in furtherance of" a Ponzi scheme must be more than related
to it, and a direct and material connection must exist between the transfer and the
fraudulent inducement intent that the Ponzi scheme presumption involves.

44

did not use the Oppenheimer name in recruiting new customers (D. SUMF ¶57), and no evidence exists that Mr. Wright shared Oppenheimer account statements with IMA's investors or potential investors or discussed the account with any third parties.  (D. SUMF ¶ 60).

Viewed in the Trustee's favor, the material facts are:  (1) IMA represented to investors that it invested in highly profitable securities trades; (2) a brokerage account — and the Oppenheimer account was the only one for most of the time period in question here — was part of the fraudulent Ponzi scheme; and (3) Mr. Wright used the Oppenheimer account to hide the fraud from IMA employees in that he could represent to them that trading in the account was producing the returns that IMA was falsely reporting to investors.

Based on these facts, the Trustee concludes that the transfers to the Oppenheimer account were in furtherance of the Ponzi scheme because the account was an essential part of it and because the transfers to it were necessary to maintain its existence.

This type of incidental necessity does not establish that the account and the transfers to it required to keep it open were a direct and material inducement to future investors.  Because Mr. Wright never shared account statements with anyone, it could not have mattered whether the account balance was one penny or $ 100 million.

45

For the foregoing reasons, the Court concludes that the Ponzi scheme presumption does not apply to establish IMA's actual fraudulent intent with regard to the transfers to the Oppenheimer account.

## G. IMA's actual fraudulent intent in the absence of the Ponzi scheme presumption

Because the Ponzi scheme presumption does not apply here, the Trustee must point to evidence in the record that establishes a material issue of fact that IMA, i.e., Kirk Wright, had the actual intent to hinder, delay, or defraud creditors when it transferred money to the Oppenheimer brokerage account.

As an initial matter, the transfers were made in exchange for contemporaneous and exactly equivalent value. The debtor sent money to Oppenheimer to purchase securities at market value and to pay commissions and fees related to the investments that it chose. The reasonableness of the fees and commissions is not in question.

To the extent that the transfers were necessary to meet margin calls and avoid liquidation of positions, IMA still received contemporaneous and equivalent value. Oppenheimer could have liquidated securities to cover the margin calls. The margin deficiencies arose because of changes in the market occurring *after* investments made at market prices as a result of previous transfers. Margin call payments were, in substance and effect, the purchase of securities that would

otherwise have been liquidated.  Simply put, transfers to meet margin calls did not

deplete the debtor's net worth and did not remove any assets from IMA or from the

reach of creditors.  The form of IMA's assets changed, but not their total realizable

market values at the times of the transfers.[54]

Mr. Wright could not have made the transfers with the actual intent to

hinder, delay, or defraud creditors in the usual sense of attempting to put assets

beyond the reach of creditors because, as a matter of undisputed fact, the transfers

did not reduce either the "net worth" of the Ponzi scheme enterprise or the assets

available for distribution to creditors.  To conclude otherwise would require the

rather ridiculous assumption that Mr. Wright transferred funds to the brokerage

account with the intent of losing money in ill-considered trading activity.

The Trustee does not assert this type of fraudulent intent in the mind of Mr.

Wright.  Rather, the Trustee asserts that Mr. Wright's intent in making the transfers

was to keep the Ponzi scheme going.  In other words, the Trustee's position is that

Mr. Wright made the transfers in order to fraudulently induce future investors to

advance funds to continue to fuel the Ponzi scheme.

In this regard, the Trustee asserts that Mr. Wright used the Oppenheimer

---

[54] The court notes that the court in *Bear Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund Ltd.)*, 397 B.R.. 1, 9 (S.D.N.Y. 2007), discussed *supra* note 53, concluded that transfers to a brokerage account to meet margin calls removed assets from creditors.  The Court disagrees with that conclusion for reasons set forth in the text.

account "specifically to prevent the disclosure of the scheme during 2005."[55]  In

particular, the Trustee notes that key IMA employees had insisted on the opening

of a "transparent" account at Lehman Brothers to which they had access and that

would be reviewed by third parties.  Shortly after the account opened, Wright's

trading in the account produced losses of over $ 13 million.[56]

> The Trustee explains:[57]
>
> [Wright] could not continue to assert high returns and continue the
> Ponzi scheme if the account was "transparent" and reviewed by third
> party professionals.  Consequently he created a controversy with
> Lehman, claiming that it erred in executing his trades, and moved the
> money to Oppenheimer.  Unlike the Lehman account, only Wright
> had access to what occurred in the Oppenheimer account.  Thus he
> was able to postpone the collapse of the scheme for almost a year.
> Even without a Ponzi scheme presumption, a reasonable jury could
> find from this evidence that Wright transferred the funds to
> Oppenheimer to preclude the discovery of the fraud.

The Trustee's evidence permits an inference that Wright established the

brokerage account and maintained it with transfers to it for the purpose of

continuing the Ponzi scheme.  Under this inference, Wright's intent in making the

---

[55] Trustee Brief  at 10 [241 at 15].

[56] *Id.*

[57] *Id.* at 10-11 [241 at 15-16] (citations omitted).

transfers to the Oppenheimer account was to fraudulently induce future investors to put money in.[58]

Fraudulent inducement intent is precisely the type of intent that the Ponzi scheme presumption establishes, as Part II(C) explains.  The legal question is whether such fraudulent inducement intent satisfies the requirement of "actual intent to hinder, delay or defraud" creditors for purposes of § 548(a)(1)(A) when the presumption does not apply because the transfer is not "in furtherance" of the Ponzi scheme.

Fraudulent transfer law has its origin in preventing a debtor from hindering, delaying, or defrauding creditors by putting assets beyond their reach.[59]  In a Ponzi scheme case, however, the Ponzi scheme presumption extends the conduct that triggers avoidance of a transfer as actually fraudulent from a transfer intended to deplete the debtor's assets to a transfer that fraudulently induces future investors to transfer money to the debtor.  In connection with operation of the good faith defense, the presumption permits recovery of principal from an investor who knew

---

[58] This is not the only inference that a jury might make from the evidence in this case.  For example, a jury might conclude that Wright set up the brokerage account with the intent of achieving huge returns that would enable him to pay off investors or to have more money for his own purposes.  Although the disastrous results would indicate that his decisions were ill-advised and unrealistic, it does not make sense that Mr. Wright intended to lose substantial money as part of the Ponzi scheme.

[59] *Supra* pages 18-20.

or, after appropriate inquiry, would have discovered, that the debtor was insolvent

or was operating a Ponzi scheme.    The policy justification for this result is that

earlier victims of the scheme should not be able to retain the principal repayment

they received that came from money fraudulently taken from later ones.[60]

---

[60] *See, e.g., Merrill v. Abbott (In re Independent Clearing House Co.),* 77 B.R. 843,
870 (D. Utah 1987) (discussed *supra* at 26-28); *Stoebner v. Ritchie Capital
management (In re Polaroid Corp.)*, 472 B.R. 22, 33-34 (Bankr. D. Minn. 2012),
*aff'd on other grounds,* 779 F.3d 857 (8th Cir. 2015).  *See generally* Brubaker
Report at 31-34 [205-1 at 41-44].

The court in *Independent Clearing House* stated, 77 B.R. at 870:

> The law allowing a trustee to avoid payments of fictitious Ponzi
> scheme profits as fraudulent conveyances embodies the principal [sic]
> that no one should profit from a fraudulent scheme at the expense of
> others.  Were the defendants allowed to keep payments in excess of
> their undertakings, they would be profiting at the expense of those
> who entered the scheme late and received little or nothing.  The
> fortuity that these defendants got into the scheme early enough to
> make a profit should not entitle them to a reward at the expense of
> equally innocent undertakers who entered the scheme later, perhaps as
> a result of misplaced faith borne of prior undertakers' success.  On the
> other hand, if the trustee is allowed to avoid transfers of fictitious
> profits the defendants are not hurt but will be in roughly the same
> position there were in before they entrusted their money to the
> debtors. . . .We therefore hold that, to the extent the defendants
> received more than their undertaking, the debtors did not receive a
> reasonably equivalent value in exchange for the transfers, the
> defendants did not give value in exchange for the transfers, and the
> trustee can avoid the transfers under section [548(a)(1)(B)], as well as
> under section [548(a)(1)(A)].

The court in *Polaroid Corporation* observed, 472 B.R. at 33-34 (quoting *In
re Petters Co., Inc.,* 440 B.R. 805, 806 (Bankr. D. Minn. 2010), *aff'd on other
grounds,* 779 F.3d 857 (8th Cir. 2015) (original editorial marks):

The Ponzi scheme presumption expands the concept of the actual intent to "hinder, delay, or defraud" a creditor required for avoidance of a fraudulent transfer within the meaning of §548(a)(1)(A) to include the intent to fraudulently induce future investors. The legal question is whether this expansion should be further extended to transfers to which the presumption does not apply.

As Part II(E) explains, courts in applying the presumption have noted that it must have some limits and that not all transfers made in the course of a Ponzi scheme qualify as fraudulent transfers. If fraudulent inducement intent is sufficient in circumstances when the presumption does not apply, no limits effectively exist because, under this rule, every transfer that a Ponzi operator makes for ordinary

---

> Ultimately, the notion behind the use of avoidance remedies against a satisfied, earlier investor is that its payment was made with the money of later victim-investors, and very much to the detriment of them, their contemporaneous fellow-creditors, and future creditors of the entities purveying the scheme. So, to meet bankruptcy's goal and context — to "put [ ] all parties that transacted with the purveyor . . . onto a parity in . . . restitution" — those who got out early, at least within the "periods of vulnerability to avoidance or recovery specified by [applicable] law," are legally compelled to pay into the estate and then may share pro rate with all victim-claimants at the end of the process.

Professor Brubaker argues, Brubaker Report at 31-34 [205-1 at 41-44], that this rationale is based on common-law restitution principles and that application of the actual fraud provisions of § 548(a)(1)(A) to permit recovery from Ponzi scheme investors results in "a functional substitute for a state-law restitution action under § 544(b)(1)." *Id.* at 32 [205-1 at 42]. His argument relies in part on Justice Breyer's distinction between the restitution remedy and the law of fraudulent transfers, as a First Circuit Judge, in *Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1507-08 (1st Cir. 1987).

expenses (rent, utilities, employees), in some sense, must be intended to further the scheme. A conclusion that fraudulent inducement intent is sufficient to establish actual intent to hinder, delay, and defraud creditors even when the Ponzi scheme presumption does not apply would eliminate the "in furtherance of" limitation on the presumption.

Moreover, the policy justification that supports application of the Ponzi scheme — one who receives repayment of principal who knows or should know that it is coming from money fraudulently obtained from later victims of the Ponzi scheme — does not exist when a noninvestor receives a transfer that does not deplete the debtor's assets because it is for contemporaneous and equivalent value.

The Court concludes, therefore, that the principles that justify the Ponzi scheme presumption and that limit its availability to a transfer "in furtherance of" the scheme limit "actual intent to hinder, delay, or defraud creditors" to an intent to put assets beyond the reach of creditors when the transfer is not "in furtherance of" a Ponzi scheme. When the only fraudulent intent in making transfers that are not "in furtherance of" a Ponzi scheme as just defined is the fraudulent inducement of future investors and when the transfers are to third parties who are not participants in the scheme and have no knowledge of it, an actual intent to hinder, delay, or defraud creditors within the meaning of § 548(a)(1)(A) does not exist. The Court declines to extend the fraudulent inducement principles that underlie the Ponzi

scheme presumption to transfers to a third party for contemporaneous equivalent value in the absence of any evidence that the party participated in the scheme itself or had actual knowledge of it.

It is undisputed that Oppenheimer had no actual knowledge of the Ponzi scheme and did not participate in it.  Because the transfers to the brokerage account were not in furtherance of the Ponzi scheme, the Ponzi scheme presumption does not apply.  When the presumption is inapplicable, a debtor's intent to fraudulently induce future investors does not constitute "actual intent to hinder, delay, and defraud creditors" within the meaning of § 548(a)(1).  No evidence in the record supports an inference that IMA intended to, or did, make the transfers to the brokerage account to remove assets from the estate or to conceal them from creditors.

## H.  Conclusion on issue of actual fraudulent intent

Oppenheimer is entitled to summary judgment in its favor as a matter of law because the record does not contain evidence sufficient to establish that IMA made the transfers to the brokerage account with the actual intent to hinder, delay, or defraud creditors as § 548(a)(1)(A) requires.

# III.  Equivalent Value as a Defense

Oppenheimer bases its second ground for summary judgment on the undisputed fact that the transfers to the brokerage account did not harm IMA or

otherwise deplete its assets.  Courts have recognized the principle that

Oppenheimer advances.[61]

At the same time, courts have observed that, in a case seeking avoidance of a

transfer under §548(a)(1)(A) based on actual intent to hinder, delay, or defraud

creditors, avoidance may occur even if the debtor received equivalent value in the

exchange.[62]

---

[61] *E.g.*, *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181
(11th Cir. 1987) ("Fraudulent transfers are avoidable because they diminish the
assets of the debtor to the detriment of all creditors. . . . [T]he essential question
presented by section 548 claims [is]:  did the transfer diminish the assets of the
debtor?"); *Ivey v. First Citizens Bank & Trust Co. (In re Whitley)*, 539 B.R. 77
(M.D.N.C. 2015), *appeal filed*, Docket No. 15-2209 (4th Cir. Oct. 19, 2015);  *Bryce
v. National City Bank*, 17 F. Supp. 792, 796 (S.D.N.Y. 1936), ("Any transfer which
does not deplete [the debtor's] assets cannot amount to more vis-a-vis the creditors
of the transferor than an injuria absque damno.") (citation omitted), *aff'd* 93 F.2d
300 (2d Cir. 1937); *see* Brubaker Report at 27-29 [205 at 37-39].  *See also
Stathopoulos v. Alford (In re McMillin)*, 482 F. App'x 454, 456 (11th Cir. 2012)
(unpublished) ("The purpose of avoiding fraudulent transfers is to prevent the
debtor from diminishing funds that are generally available for distribution to
creditors."); *Scholes v. Lehman*, 56 F.3d 750, 756, 757 (7th Cir. 1995) ("A transfer
for full in the sense of commensurate consideration cannot (in the ordinary case,
anyway) hinder, defraud, or otherwise discomfit creditors, because it is merely
replacing one asset with another or equivalent value, as with revolving credit." "If
valuable consideration means full consideration, then even if there is intent to
defraud there can be no harm to creditors, since the debtor's estate has not been
depleted by a cent.") (pre-UFTA Illinois law).  *See generally* 5 COLLIER ON
BANKRUPTCY ¶ 548.01[1][a].

[62] *E.g.*, *Brown v. Third National Bank, N.A. (In re Sherman)*, 67 F.3d 1348, 1355
n.6 (8th Cir. 2011) (Actual fraudulent transfer may occur even if for fairly
equivalent consideration and even though creditors are merely hindered or
delayed.); *Tavenner v. Smoot (In re Smoot)*, 257 F.3d 401, 407 (4th Cir. 2001)
("Nothing in § 548 indicates that a trustee must establish that a fraudulent

Oppenheimer's position is inconsistent with the statutory scheme of § 548.[63]
That scheme begins, in § 548(a)(1)(A), with the rule that a transfer is avoidable if
the debtor made it with the actual intent to  hinder, delay, or defraud creditors.
Section 548(a)(1)(A) does not address value at all.  The only requirement for
avoidance of a transfer is the requisite fraudulent intent on the part of the debtor.

Section 548(c) addresses the question of value in exchange for the transfer.
When applicable, § 548(c) permits a transferee to retain a transfer to the extent that
the transferee gave value to the debtor in exchange for the transfer.

But § 548(c) also requires that the transferee take for value "in good faith."
Thus, Oppenheimer is not entitled to summary judgment on the ground that the
transfer did not diminish the estate in the absence of a showing that it took in good
faith.  The Court addresses this issue in the next Part.

---

conveyance actually harmed a creditor."); *Christian Bros. High Sch. Endowment v.
Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 304
(S.D.N.Y. 2010) ("A fraudulent transfer may be avoided in its entirety . . . whether
or not the debtor received value in exchange for the transfer."); *Development
Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776,
794 (Bankr. S.D. Fla. 2000);  *see* 5 COLLIER ON BANKRUPTCY ¶548.02; *cf. Davis v.
Davis (In re Davis)*, 911 F.2d 560, 562 (11th Cir. 1990) (In upholding denial of
debtor's discharge based on transfer of residence with intent to hinder, delay, or
defraud a creditor under 11 U.S.C. § 727(a)(2), the court stated, "To hold now that
there occurred no transfer of property with the intent to hinder creditors merely
because the debts on the residence exceeded its … value would be to reward [the
debtor] for his wrongdoing, which this court refuses to do.") (quoting *Future Time,
Inc. v. Yates*, 26 B.R. 1006, 1009 (M.D. Ga.), *aff'd* 712 F.2d 1417 (11th Cir. 1983)).

[63] *See Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial,
Inc.),* 250 B.R. 776, 794 (Bankr. S.D. Fla. 2000).

# IV.  Oppenheimer's Good Faith
# Required for § 548(c) Defense

Oppenheimer's final ground for summary judgment is that it gave value for the transfers in good faith.  Section 548(c) provides that a transferee of a fraudulent transfer that takes the transfer "for value and in good faith . . . may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer. . . ."

The Trustee does not dispute that Oppenheimer took the transfers for value,[64] and, as Part II(G) explains, the value was contemporaneous and exactly equivalent to what IMA received.  The transfers did not deplete IMA's assets.

The question, then, is whether Oppenheimer took the transfers in good faith.  The Eleventh Circuit has not addressed the issue of good faith under § 548(c) in the context of the facts presented here.[65]

---

[64] Trustee's Brief at 15 [241 at 20].

[65] *See Kapila v. Integra Bank, N.A. (In re Pearlman)*, 440 B.R. 569, 577 (Bankr. M.D. Fla. 2010).

The Eleventh Circuit discussed "good faith" in the context of the "mere conduit or control" exception to transferee liability under 11 U.S.C. § 550(a)(1) in *Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312, 1322-23 (11th Cir. 2010).  The court ruled that, to invoke the defense, the transferee must establish that it served merely as a conduit for assets that were actually under the control of the debtor and that it "acted in good faith and as an innocent participant in the fraudulent transfer." *Id.* at 1323.  The court did not, however, elaborate on the standards for determining good faith.  Later text*, infra* at 62-63, also discusses *Harwell*.

Two unpublished decisions of the Eleventh Circuit arguably indicate that an objective standard governs determination of a transferee's good faith.

In *Perlman v. Bank of America, N.A.*, 561 F. App'x 810, 814 (11th Cir. 2014) (unpublished), the district court in an action by a receiver for entities operating a Ponzi scheme granted a motion to dismiss the count of the receiver's complaint against a bank to recover deposits in the debtor's bank account as actually fraudulent transfers under Florida law on the ground that the "mere conduit" rule applied. The Eleventh Circuit reversed because a complaint need not anticipate an affirmative defense, noting that allegations of suspicious or irregular activity with regard to the accounts "at the very least, cast some doubt on [the bank's] good faith, and preclude a finding that the 'mere conduit' defense was apparent from the face of the amended complaint."

In *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 994 (11th Cir. 2014) (unpublished), the district court in another action by the same receiver against another bank likewise granted a motion to dismiss the Florida fraudulent transfer count on the basis of the "mere conduit" rule. The trial court also denied the receiver's motion for leave to amend the complaint to add additional allegations.

The Eleventh Circuit affirmed the grant of the motion to dismiss because the allegations of the complaint "affirmatively and clearly" showed that the "mere conduit rule" applied to the transfers. With regard to the element of good faith that the defense requires, the court ruled that the allegations of "red flags" were insufficient to establish the bank's actual knowledge of existence of the Ponzi scheme or that an ordinary prudent person would have been induced to make inquiry or investigate.

The Eleventh Circuit reversed denial of leave to amend because the additional allegations were sufficient to establish or at least create a plausible inference that the bank had actual knowledge of the Ponzi scheme, such that the proposed amendment was not futile.

Although both cases indicate that an objective standard applies to the good faith element of the defense to a fraudulent transfer, the Court concludes that they do not require an objective standard in this case.

First, because they are unpublished, they are not binding precedent. 11th Cir. Rule 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

## A.  The objective standard for determining good faith

Some courts have ruled that an objective standard governs determination of good faith for purposes of §548(c) and that a transferee with knowledge or notice of the debtor's financial difficulties or fraudulent purpose cannot invoke the good faith defense.[66]  The court in *Christian Bros. High School Endowment  v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC),* 439 B.R. 284, 310, 313 (S.D.N.Y. 2010) (citations and internal quotations omitted) summarized the objective approach:

> The good faith test under Section 548(c) is generally presented as a two-step inquiry.  The first question typically posed is whether the transferee had information that put it on inquiry notice that the

Second, the cases do not hold that an objective standard governs the good faith determination.   The relevant holdings are (1) that the complaint in *Perlman v. Bank of America, N.A.*, and the originally dismissed complaint in *Perlman v. Wells Fargo Bank, N.A*, failed to allege *either* actual knowledge or facts that would require inquiry or investigation and (2) that the proposed amended complaint in *Perlman v. Wells Fargo Bank, N.A.*, sufficiently pled actual knowledge of the Ponzi scheme.   The courts did not consider whether a transferee could establish a good faith defense on the basis of lack of actual knowledge without regard to what an inquiry would have uncovered.

[66] *E.g.*, *Hayes v. Palm Seedlings Partners-A (In re Agricultural Research & Technology Group, Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990); *Christian Bros. High School Endowment  v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 310-13 (S.D.N.Y. 2010); *Wiand v. Waxenberg*, 611 F. Supp.2d 1299, 1319-20 (M.D. Fla. 2009); *Gredd v. Bear, Stearns Securities Corp. (In re Manhattan Investment Fund, Ltd.)*, 359 B.R. 510, 522-24 (S.D.N.Y. 2007); *Kapila v. Integra Bank, N.A. (In re Pearlman)*, 440 B.R. 569, 576-77 (Bankr. M.D. Fla. 2010); *Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.)*, 275 B.R. 641, 658-59 (Bankr. M.D. Fla. 2002).

transferor was insolvent or that the transfer might be made with a fraudulent purpose. . . .

. . . .

Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a "diligent investigation" requirement . . . . The test is most commonly phrased . . . as whether diligent inquiry would have discovered the fraudulent purpose of the transfer.

If this standard applies, Oppenheimer has failed to establish that no dispute of material fact exists with regard to its good faith. The Trustee's expert has identified a number of "red flags" that, in his opinion, should have put Oppenheimer on inquiry notice that IMA "could be engaged in fraudulent activity or other violations of the securities laws" and that Oppenheimer "failed to conduct any reasonably thorough investigation."[67]  (Later text discusses the "red flags.")

Although Oppenheimer disputes the expert's opinions, specifically contends that they do not establish that a diligent investigation would have uncovered the fraud, and points out that its expert testified that a commercially reasonable inquiry would not have revealed the fraud,[68] the Court cannot conclude that a reasonable

---

[67] Trustee Brief at 18 [241 at 23]; see also *id.* at 15-21 [241 at 20-26]; T. SAMF ¶¶ 29-42.

[68] Oppenheimer's Reply Brief at 12-15 [247 at 17-20].

jury could not find that Oppenheimer was on inquiry notice and that an appropriate investigation would have uncovered the fraud.  If an objective standard governs the determination of good faith for purposes of §548(c), Oppenheimer is not entitled to summary judgment on this point.[69]

The legal question is whether an objective standard that imposes a duty of inquiry applies here.

## B.  Good faith in an arm's-length transaction for equivalent and contemporaneous value

When a transferee is someone like an insider,[70] an investor in a Ponzi scheme who receives payment on an antecedent debt,[71] or a marketer of the Ponzi

---

[69] *See, e.g.*, *Wiand v. Waxenberg*, 611 F. Supp.2d 1299, 1319-20 (M.D. Fla. 2009); *Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund Ltd.)*, 397 B.R. 1, 22-26 (S.D.N.Y. 2007); *O'Connell v. Penson Financial Services, Inc. (In re Arbco Capital Management, LLP)*, 498 B.R. 32 (Bankr. S.D.N.Y. 2013); *Kapila v. Integra Bank, N.A. (In re Pearlman)*, 440 B.R. 569, 577-578 (Bankr. M.D. Fla. 2010).

[70] *E.g.*, *Wiand v. Waxenberg*, 611 F. Supp.2d 1299, 1319-20 (M.D. Fla. 2009) (wife of perpetrator); *Leonard v. Coolidge (In re National Audit Defense Network)*, 367 B.R 207, 223 (Bankr. D. Nev. 2007).

[71] *E.g.*, *Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Technology Group, Inc.)*, 916 F,2d 528, 535 (9th Cir. 1990); *Wiand v. Waxenberg*, 611 F. Supp.2d 1299, 1319-20 (M.D. Fla. 2009); *Christian Bros. High School Endowment  v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 310-313 (S.D.N.Y. 2010).

investment who actively participates in procuring the fraudulent investments,[72] an objective standard may be appropriate.  Insiders and participants in marketing the fraudulent scheme are properly charged with knowledge of the facts that should come to their attention as a result of "red flags" that should give rise to an inquiry. In the case of transfers to repay Ponzi investors, a concern is that earlier Ponzi investors should not knowingly profit at the expense of the later ones by getting their money out through repayment with funds of later victims before the scheme collapses.[73]  An objective standard of inquiry notice insures that their withdrawal of funds is not motivated by a desire to do just that.

An objective standard does not make sense, however, when the transfers are to an unaffiliated third-party in arm's-length transactions that occur in the ordinary course of business on ordinary business terms and the debtor receives contemporaneous and exactly equivalent value for the transfer.  When all of these circumstances are present, the transfers bear no indicia of fraud or any wrongdoing on the part of the transferee.  Such a transferee has not obtained any advantage over defrauded investors or any other creditors.

An objective standard of good faith in such situations would effectively impose liability for negligence in failing to recognize "red flags" and to conduct an

---

[72] *E.g.*, *Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.)*, 275 B.R. 641, 658-59 (Bankr. M.D. Fla. 2002).

[73] See *supra* note 60 and accompanying text.

investigation. The application of an objective standard of good faith in the context of ordinary business transactions would impose an unreasonable burden on ordinary commerce and is beyond the purpose and intent of the fraudulent transfer laws.

In *Martinez v. Hutton (In re Harwell),* 628 F.3d 1312, 1322-23 (11th Cir. 2010), the Eleventh Circuit addressed good faith in the context of the "mere conduit or control" exception to fraudulent transfer liability for certain transferees under § 550(a)(1).  The court ruled that, to escape liability for the receipt of a fraudulent transfer under § 550(a)(1) under this equitable defense, the transferee must establish that it "merely served as a conduit for the assets that were under the actual control of the debtor-transferor *and* that [it] acted in good faith and as an innocent participant in the fraudulent transfer."  *Id.*  at 1323.

Courts developed the exception as an equitable doctrine, the court explained, "to prevent the unjust or inequitable result of holding an innocent transferee liable for fraudulent transfers where the innocent transferee is a mere conduit and had no control over the funds transferred." *Id.* "In effect," the court stated, "we have tempered literal application of § 550(a)(1), examining all the facts and circumstances surrounding a transaction to prevent recovery from a transferee innocent of wrongdoing and deserving of protection."  *Id.* at 1322-23.

The *Harwell* court did not address what standard governs the determination

of good faith for purposes of the "mere conduit or control" defense, and the

standard for considering good faith for purposes of that equitable, judicially crafted

exception is not necessarily the same as the standard for application of the statutory

good faith defense in § 548(c).  Nevertheless, the considerations that *Harwell*

identified — protection of an innocent transferee deserving of protection —

support an application of the good faith requirement of § 548(c) to accomplish that

objective.  When transfers occur in ordinary business transactions under ordinary

business terms to an unaffiliated third party in an arm's-length transaction for

exactly equivalent value, such a third-party transferee with no actual knowledge of

the underlying fraud has acted in good faith regardless of whether a retrospective

examination of the circumstances might indicate that it was aware of facts that

could have put it on notice of the fraud.  Such a transferee is "innocent of

wrongdoing and deserving of protection."  *In re Harwell,* 628 F.3d at 1322-23.

The Court concludes, therefore, that, when the circumstances identified

above are present, the transferee has acted in good faith within the meaning of

§ 548(c) in the absence of actual knowledge of the insolvency of the debtor or the

existence of a Ponzi scheme.

All of the required circumstances for Oppenheimer to establish its good faith

defense are present here. The transfers were for exactly equivalent,

contemporaneous value. Oppenheimer is an unaffiliated third party that engaged in

arm's-length transactions with IMA in the ordinary course of Oppenheimer's

business in accordance with usual terms in the industry.  Although the Trustee has

produced evidence of irregularities in the original documentation and

establishment of the brokerage account (discussed in later text), they can only be

described as technical and immaterial in view of the actual course of dealing that

occurred.

It is true that two checks were dishonored, but they were promptly made

good.  An occasional deviation from standard business practice does not establish

that transactions are outside the ordinary course of business.

Finally, it is undisputed that Oppenheimer did not have any actual

knowledge of the Ponzi scheme or of IMA's insolvency.

The undisputed material facts show that Oppenheimer received the transfers

into the IMA brokerage account for exactly equivalent value as an unaffiliated

third party in arm's-length transactions in the ordinary course of business and in

accordance with ordinary business terms and had no actual knowledge of IMA's

insolvency or the existence of the Ponzi scheme.  The Court concludes that the

undisputed material facts establish as a matter of law that Oppenheimer received

the transfers in good faith.

## C.  Subjective good faith under the *Teleservices* analysis

The analysis of good faith under § 548(c) in *Meoli v. The Huntington*

*National Bank (In re Teleservices Group, Inc.),* 444 B.R. 767 (Bankr. W. D. Mich. 2011), provides an alternative basis to conclude that Oppenheimer received the transfers in good faith.  In a thorough, scholarly, and well-reasoned study of the good faith standards, the court concluded that the good faith determination under § 548(c) is a subjective one that requires consideration of the transferee's honesty, trust, and integrity.  *Id.* at 774, 795-812, 843.  When a debtor makes an intentionally fraudulent transfer, the court reasoned, the crucial question is whether the transferee knew of the debtor's fraud.  *Id.* at 803, 811.

Having thus framed the legal standard, the court considered the evidentiary question of how the transferee's lack of knowledge of the fraud could be proved. The court observed that, because debtors seldom admit their fraudulent intent, courts rely on the "badges of fraud" to provide circumstantial evidence of a debtor's fraudulent intent.  The court concluded that a transferee's knowledge of the same badges could likewise be used to assess the transferee's knowledge of the debtor's fraudulent intent. 444 B.R. at 813-14.  And because a transferee "is no more likely to admit his actual knowledge than is a debtor likely to admit his actual intent," the court continued, "courts have also long recognized that something short of admitted knowledge will suffice.  Willful blindness is the term often used to describe this alternate state of awareness."  *Id.* at 814.

The good faith question under the *Teleservices* analysis is whether the

transferee of a fraudulent transfer was "willfully ignorant of facts that would cause it to be on notice of a debtor's fraudulent purpose"[74] or "intentionally shut his eyes to the truth" when "he had such notice and information as made it his duty to inquire further, and that the slightest effort by him in that direction would have discovered the whole fraud."[75]  444 B.R. at 814.  To maintain a § 548(c) good faith defense, the court explained, the transferee must establish "that he conducted himself appropriately as various badges of fraud came to his attention."  *Id.* at 815.

Because the test is a subjective one, the court continued, it "allows for conduct that falls short of what prudence or what accepted norm might otherwise expect.  The test is not . . . how well [the transferee] measured up against what others in the community might have done in its stead.  Rather, [the transferee's] conduct is to be tested based upon its own honesty and integrity — i.e., its good faith — as it became aware of more and more indicators of [the debtor's] fraud upon its creditors."  *Id.*  at 815.  The *Teleservices* court specifically rejected the transferee's negligence and disregard of either regulatory authorities or its own policies and procedures in determining its good faith.  *Id.* at 817.

*Teleservices* analyzed the good faith defense in a fraudulent transfer action

---

[74] 444 B.R. at 814 (quoting *Bayou Accredited Fund, LLC  v. Redwood Growth Partners (In re Bayou Group, LLC)*, 396 B.R. 810, 884 (Bankr. S.D.N.Y. 2008), *rev'd in part*, 439 B.R. 284 (S.D.N.Y. 2010)).

[75] 444 B.R. at 814 (quoting *Harrell v. Beall*, 84 U.S. (17 Wall) 590, 591(1873)).

based on depletion of assets where the transferee received payment of an antecedent debt of a third party. It involved neither a Ponzi scheme nor a transfer for exact equivalent value. Application of the good faith standard set forth in *Teleservices,* therefore, requires adjustments to take account of the different nature of the fraud at issue in a Ponzi scheme case.

First, the focus in *Teleservices* on the transferee's awareness of badges of fraud has little, if any, relevance in a Ponzi scheme situation. If it did, Oppenheimer clearly must prevail. Nothing in the record before the court indicates that Oppenheimer had notice of any facts that would lead it to suspect the existence of any of the badges of fraud except, perhaps, IMA's lack of liquidity, inadequate capitalization, or insolvency. Indeed, none of the other badges of fraud even exist.

This is not surprising. The badges of fraud are circumstances that permit a determination that a debtor fraudulently intended to remove assets from the reach of creditors. Because the fraudulent intent of a Ponzi scheme debtor is the fraudulent inducement of later investors, not the removal of assets from the reach of existing creditors, the proper good faith inquiry must focus on whether the transferee was aware of facts that would indicate that the debtor is operating a fraudulent Ponzi scheme.

Second, the situation of a transferee, as in *Teleservices,* who is receiving transfers in payment of an antecedent debt is different from that of a transferee like

67

Oppenheimer who is receiving transfers for exact equivalent and contemporaneous value.[76]  For reasons discussed above,[77] it is appropriate to expect more inquiry from a creditor receiving payment of its debt because of the need to insure that it is not unfairly receiving payment ahead of others than from a transferee in an arm's-length transaction.  This distinction requires a different assessment of the honesty and integrity of the transferee.

In *Teleservices,* the transferee was a bank that had made a commercial loan to its borrower secured by the borrower's accounts receivable and other collateral.  The debtor, another entity under the control of the principal of the borrower, transferred funds to the borrower's bank account with the actual intent to defraud the debtor's creditors, and the bank used the funds to pay down the borrower's debt.  The bank contended that it acted in good faith because the borrower had represented that the funds received from the debtor were collections of the borrower's accounts receivable.  In fact, the transferred funds were proceeds of fraudulent loans the debtor had obtained.

The *Teleservices* court concluded that the good faith question "boil[ed]

---

[76] As explained in earlier text, *supra* at 46-47, although transfers to meet margin calls reduce debt, they are substantively the same as transfers to purchase securities and are not in payment of antecedent debt; the payment of antecedent debt arises from the broker's security interest in assets already transferred and occurs due to changes in market values after the transfer.

[77] *Supra* at 60-61.

down to simply this:  Did [the bank] ever reach the point where it could no longer

legitimately cling to its belief that the [debtor's] transfers were only [the

borrower's] collected receivables?"  *Teleservices,* 444 B.R. at 818.[78]

Posing the determinative question with the words "legitimately," "cling,"

and "belief" implies a starting point in terms of awareness of facts that includes

some suspicion that something is not quite right in the relationship – a wholly apt

description of the *Teleservices* situation where the bank was concerned about the

source of funding for the borrower's bank account and the validity of the accounts

receivable that served as its collateral and was aware that it was receiving funds

from someone other than its borrower.  In that context, the question of whether and

when suspicion became awareness is the proper test of honesty and integrity.

That is not the proper starting point when the transfer is for equivalent and

contemporaneous value and collection of a debt is not the issue.  The proper

---

[78] *Teleservices* involved several different types of transfers at different times.  The
text discusses what the *Teleservices* court referred to as the "indirect transfers."
The debtor made the indirect transfers to the borrower's bank account, at which
point the bank applied them to the borrower's debt.  The court assumed for
purposes of its opinion that the transfer from the debtor to the borrower was a
fraudulent transfer and that the bank was liable as a subsequent transferee under
§ 550(a),  444 B.R. at 791, unless it could establish a defense under § 550(b)(1),
which among other things requires that the subsequent transferee receive the
transfer in good faith.  The good faith question quoted in the text, therefore,
involves good faith under § 550(b)(1), not under § 548(c), but the distinction is
immaterial for present purposes because the court concluded that the good faith
requirement under both sections is the same.  *Id.* at 811-13.

question here is:  Did Oppenheimer ever reach the point where it could not assume

that  IMA was operating a legitimate brokerage account?  And as the *Teleservices*

analysis instructs, the answer depends on whether Oppenheimer was willfully

ignorant of — or turned a blind eye to — facts that would give rise to a belief that

IMA was operating a Ponzi scheme.

In the context of Oppenheimer's motion for summary judgment, the issue is

whether the record shows any disputes of material fact with regard to these

questions.  Viewing the evidence with all inferences resolved in the Trustee's

favor, the undisputed material facts with regard to the good faith issue under the

*Teleservices* analysis are as follows.

Oppenheimer opened an account for IMA as Kirk Wright requested.[79]

Oppenheimer permitted margin trading subject to margin requirements to ensure

that its extensions of margin credit would be paid.[80]  Oppenheimer received money

from IMA to fund the account, executed trades as Mr. Wright directed, and made

disbursements to IMA as he directed.  All trades were made at market value.[81]

The Trustee contends that irregularities, discussed below, occurred in the

opening and documentation of the account.  The Court concludes that these

---

[79] D. SUMF ¶ 7.

[80] D. SUMF ¶¶ 10, 12.

[81] D. SUMF ¶¶ 6, 30-33, 35.

irregularities were technical in nature and did not affect the fundamental facts that the account was opened in the name of IMA, that funding of the account came from IMA bank accounts, that withdrawals went to an IMA bank account, and that all transactions were conducted in the name of IMA.

Oppenheimer received commissions for its brokerage services, the reasonableness and legitimacy of which are not challenged.[82]  Except for the "red flags" discussed below, nothing with regard to the brokerage relationship was out of the ordinary or suggests that Oppenheimer did not act with honesty and integrity with regard to the account.

The Trustee contends that evidence in the record[83] shows that Oppenheimer ignored numerous "red flags"[84] concerning IMA's financial condition that gave rise to a duty to conduct a diligent investigation[85] based on the "standards, norms, practices, sophistication and experience generally possessed by participants in the transferee's industry."[86]  The Trustee accurately states the objective test of good

---

[82] D. SUMF ¶ 80.

[83] T. SAMF ¶¶ 30-45.  The primary evidence is the Expert Report of Paul F. Meyer, Trustee's Exhibit 7 [240-6] and his deposition testimony, Trustee's Exhibit 6 [240-5].

[84] The "red flags" are identified on pages 9-11 of Mr. Meyer's Expert Report. [240-6 at 10-11].

[85] Trustee Brief at 15-21 [241 at 20-26].

[86] Trustee Brief at 17 [241 at 22], quoting *Christian Bros. High School Endowment*

faith, but that is not what § 548(c) requires under the *Teleservices* analysis. The proper test, rather, is whether Oppenheimer "willfully ignored" or "turned a blind eye" to facts that would have caused it to believe that IMA was operating a Ponzi scheme.

Several red flags deal with the opening, ownership, and documentation of the account. The account representative who dealt exclusively with Mr. Wright with regard to the account was Benjamin Davis, a friend who had gone to high school with Mr. Wright's wife. Mr. Wright and Mr. Davis talked on a daily basis.[87]

Although Mr. Davis thought that the account was Mr. Wright's personal money and that the trading in it would be for his personal benefit, Mr. Davis did not obtain any financial or other information about Mr. Wright individually.[88] Instead, Mr. Davis opened the account in the name of "International Management Associates."[89] Further, although the account identified IMA as a limited liability company, and Mr. Davis understood that IMA was a limited liability company, Mr. Davis did not obtain the operating agreement or other documents about

---

*v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 313 (S.D.N.Y. 2010).

[87] T. SAMF ¶ 33.

[88] T. SAMF ¶ 34, 35.

[89] T. SAMF ¶ 34.

management authority at IMA.[90]

These irregularities are immaterial.  The parties established an account in the name of IMA and treated IMA as the owner of the account.  Perhaps these facts establish a violation of regulatory requirements or Oppenheimer's internal policies, but they do not show a lack of honesty or integrity, and they provide no basis for an inference that Oppenheimer should have been alerted to the fact that Mr. Wright was conducting a Ponzi scheme.

Another red flag is the bouncing of two checks in July 2005.  Until this time, all transfers into the account were by wire.  On this occasion, however, Mr. Wright sent two checks drawn on IMA's Bank of America account for a total of $ 1.2 million, which were returned for insufficient funds.  After Oppenheimer's demand and an exchange of emails, Oppenheimer received a wire transfer from an IMA account to cover the checks within the time it required.[91]

The bouncing of checks may be an indicator of financial difficulties, inadequate capital or liquidity, or insolvency.  This one-time event, however, provides little support for an inference that Oppenheimer should have investigated further to discover a Ponzi scheme.  In any event, the fact that Oppenheimer chose to continue the brokerage relationship with IMA after the bounced checks were

---

[90] T. SAMF ¶ 36.

[91] T. SAMF ¶ 37.

covered and did not investigate further does not give rise to an inference that IMA lacked honesty or integrity in continuing the relationship.

Another set of red flags involves trading activity in the account, including a high number of margin calls,[92] the fact that IMA met many of the margin calls through liquidation of securities rather than cash deposits,[93] the existence of large losses, an extremely large turnover rate, high trading costs as a percentage of average equity, and trading at extremely high risk, all indicating that the trading in the account did not make economic sense.[94]

Mr. Meyer opines that these red flags should have indicated to Oppenheimer management that the account's trading was not making economic sense and that it was not adequately capitalized for the trades it was making.  Therefore, he concludes, further inquiry was required that "could have resulted" in Oppenheimer's discovery of fraudulent activity at IMA.[95]

IMA's account appeared frequently on Oppenheimer's compliance exception reports, which Mr. Meyer states is a "quintessential red flag."[96] According to Mr. Meyer, a compliance exception report "puts the supervisor and

---

[92] T. SAMF ¶ 38.

[93] T. SAMF ¶ 39.

[94] T. SAMF ¶ 41.

[95] Expert Report of Paul F. Meyer at 10 [240-6 at 11].

[96] T. SAMF ¶ 40; Expert Report of Paul F. Meyer at 11 [240-6 at 12].

the firm on notice that the account needs further inquiry and a full explanation of its activity."[97]  Mr. Meyer states:[98]

> By widely-accepted custom and practice in the securities industry, such response should have included a series of escalating steps, starting with the branch manager's review of the IMA account's background, trading history and performance.  Following his review, the branch manager should have discussed the account with Davis to gain further understanding of the customer and why Davis believed the activity noted was appropriate.  The final, and most important, step in the response process should have been direct communication between Oppenheimer management and Wright.  As the SEC has noted, "In appropriate circumstances, direct communication from firms to customers, independent of the representative and his supervisor, is an important supervisory mechanism to prevent and detect wrongdoing."  Direct communication is especially important in instances where an account appears frequently on an exception report, is experiencing significant losses, is trading very frequently, and/or generating large commissions.  All of these indicators were present in the IMA account's trading.

Oppenheimer sent form letters that asked Mr. Wright to confirm that the trading in the account was consistent with his investment objectives, but the form

---

[97] Expert Report of Paul F. Meyer at 11 [240-6 at 12].

[98] *Id.* at 11-12 [240-6 at 12-13].

letters did not contain any information specific to the IMA account.[99]

Mr. Meyer opines that Oppenheimer management should have had substantive personal contact with Mr. Wright, including specific discussion of commissions and losses and confirmation of basic information regard IMA's income, net worth, investment objectives, and risk tolerance.  Further, he states, Oppenheimer's own procedures would have required it to confirm with the customer the exact titling of the account and the source of the money used to trade in the account.[100]

The red flags regarding trading activity and the existence of the compliance exception reports may raise questions with regard to Oppenheimer's compliance with regulatory requirements and its own internal policies.  Perhaps another broker would have acted differently and perhaps Oppenheimer neglected to investigate further when it should have.

But again, an objective standard that compares Oppenheimer's conduct to industry standards or evaluates its negligence is not the proper test of good faith. Rather, Oppenheimer's good faith turns on its own honesty and integrity and whether it remained "willfully ignorant of" or "turned a blind eye to" facts that would give rise to a belief that IMA was operating a Ponzi scheme.

---

[99] *Id.* at 12 [240-6 at 13].

[100] *Id.* at 12-13 [240-6 at 13-14].

Oppenheimer did not provide investment advice to IMA, and Mr. Wright personally directed every trade.[101]  Oppenheimer asked Mr. Wright to confirm that his trading was consistent with the account's investment objectives.  Rather than investigate, it chose to continue to do what it agreed to do when the account was opened:  receive funds from IMA and execute trades as Mr. Wright directed.

These facts demonstrate that Oppenheimer acted honestly and with integrity in response to the trading activity and the compliance exception reports.  Oppenheimer was not in a position where it had to be concerned about collecting a debt or where ignoring facts might improve its ability to collect a debt.

And it is too much of a leap to infer the existence of a Ponzi scheme — the fraudulent conduct that forms the basis for the avoidance of the transfers — from a debtor's trading losses, account activity that is in accordance with the terms of the brokerage account and specifically directed by its owner, and the existence of compliance exception reports.  After all, the trading losses occurred as a result of Mr. Wright's decisions, not anything Oppenheimer did.  Oppenheimer's responsibility was to execute trades as directed, not to decide whether they should be made.

---

[101] D. SUMF ¶¶ 6, 46-48.

A final red flag is that Mr. Wright "appeared unfazed by the large losses and commissions in the account."[102]  One could speculate that a customer lacks concern about losses and commissions because it is not his money and that, therefore, he must have stolen it.  One could also speculate that he is unconcerned because the losses are not material to his overall financial situation.

Such speculation is insufficient to establish the existence of a dispute of material fact with regard to Oppenheimer's honesty and integrity, i.e., its good faith.  Indeed, the Court would find it difficult to conclude that this fact would give rise to a duty of inquiry under even an objective standard.

In summary, the undisputed material facts, viewed favorably to the Trustee, that the Trustee relies on to rebut Oppenheimer's showing of good faith are:   (1) irregularities existed in the opening and documentation of the account; (2) IMA sent two checks to cover margin calls when it had never done so before, that those checks bounced, and that IMA covered them; (3) trading activity in the account was unusual and not profitable and thus did not make economic sense; (4)  the IMA account frequently appeared on compliance exception reports; and (5) Mr. Wright "appeared unfazed" by the large losses.

Collectively, these facts are insufficient to permit a reasonable jury to infer that Oppenheimer willfully ignored, or turned a blind eye to, facts that should have

---

[102] T. SAMF ¶ 42.

made it aware that IMA, through Mr. Wright, was operating a Ponzi scheme, the test under the Court's application of the *Teleservices* analysis discussed above of good faith for purposes of § 548(c).

## D.  Conclusion on good faith issue

The Court concludes that a transferee acts in good faith for purposes of the affirmative defense of § 548(c) applies when transfers are to an unaffiliated third-party in arm's length transactions under ordinary business terms and the debtor received contemporaneous and exactly value for the transfers in the absence of actual knowledge of the debtor's insolvency or the existence of a Ponzi scheme. Because the undisputed material facts show that Oppenheimer meets all of these requirements, Oppenheimer has established its good faith as § 548(c) requires.

Alternatively, under the analysis of *Meoli v. The Huntington National Bank (In re Teleservices Group, Inc.)*, 444 B.R. 767 (Bankr. W.D. Mich. 2011), a subjective standard governs the question of good faith for purposes of § 548(c). The undisputed material facts establish that Oppenheimer was not "willfully ignorant" of, and did not "turn a blind eye to" facts that would give rise to a belief that IMA was operating a Ponzi scheme.  Accordingly, Oppenheimer has meet the good faith requirement for the § 548(c) defense.

Because under either approach Oppenheimer has established its good faith as a matter of law and because it is undisputed that IMA received value for the

transfers, Oppenheimer is entitled to summary judgment on its § 548(c) defense.

# V.  Conclusion

For reasons discussed above, the Court concludes that the undisputed material facts establish that IMA is entitled to summary judgment on two of the grounds that it asserts.

First, as a matter of law based on the undisputed material facts, IMA did not make the challenged transfers with the actual intent to hinder, delay, or defraud creditors as § 548(a)(1) requires.

Alternatively, as a matter of law based on the undisputed material facts, Oppenheimer received the transfers in good faith and for value such that it has a complete defense to their avoidability under § 548(c).

Oppenheimer is not entitled to summary judgment on the ground that a transfer that does not deplete or diminish the debtor's assets cannot be avoided under § 548(a)(1)(A).

In accordance with the foregoing, it is hereby **ORDERED** that Oppenheimer's Second Motion for Summary Judgment be, and the same hereby is, **GRANTED.**

**[End of Order]**